**BASIN ELECTRIC POWER COOPERATIVE–MISSOURI BASIN POWER PROJECT, Appellant (Defendant),**

v.

**William HOWTON, Appellee (Plaintiff).**

**No. 5156.**

Supreme Court of Wyoming.

Nov. 29, 1979.

J. Kent Rutledge, Lathrop & Uchner, P. C., Cheyenne, for appellant.

Richard C. Wolf, Cheyenne, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

McCLINTOCK, Justice.

Basin Electric Power Cooperative-Missouri Basin Power Project appeals from judgment entered on verdict of a Platte County jury awarding $10,000 damages to William Howton, claimed by him to have resulted from termination of his employment with Babcock & Wilcox, wrongfully required by Basin. Basin concedes that Howton had an employment contract with Babcock & Wilcox and that this employment was terminated as the result of the intentional act of Basin. It is further conceded that Wyoming recognizes the tort of intentional interference with contractual rights. *Wartensleben v. Willey*, Wyo., 415 P.2d 613 (1966), *Board of Trustees of Weston County School District No. 1, Weston County v. Holso*, Wyo., 584 P.2d 1009, reh. denied 587 P.2d 203 (1978), and *Kvenild v. Taylor*, Wyo., 594 P.2d 972 (1979). Basin contends that the evidence is such as to establish as a matter of law that Basin was legally justified in bringing about the termination of the employment. We hold that the question of justification was one for the jury, and that there was sufficient evidence to warrant submission of the cause to the jury.

At the time of the incident Basin was the manager and part owner of the Missouri Basin Power Project near Wheatland. Babcock & Wilcox Construction Company was one of the contractors engaged in the construction of the Laramie River Power Station. Howton was employed as an ironworker by Babcock & Wilcox. On August 31, 1977, in response to a written request by Wayne L. Rickerd, field manager for Basin, Babcock & Wilcox terminated Howton's employment.

All employees working on the project were issued identification badges which were to be worn conspicuously at all times while on the jobsite. On the afternoon of August 30, as Howton was leaving the project, he was involved in an incident with a security guard concerning the showing of his badge. As appears to have been the common practice for many workers on the job, Howton's badge was attached to the carrying strap of his lunch box but as he walked through the gate Dave Barber, the security guard, apparently did not see the badge. Barber, who did not testify at the trial, pursued Howton into the parking area, demanding that he show his badge. A heated argument took place outside the gate, with some name-calling and shouting by both parties. The incident concluded when Barber took the badge away from Howton. He wrote a short report concerning the incident, indicating that Howton had refused to show his pass and had given him considerable trouble.

When Howton arrived for work the next morning without his badge he was taken into the security office. In subsequent discussion with Norman Slipsager, the security supervisor, and Danny K. Stormer, another guard then present, Howton said that he had complied with security rules but had been harassed by Barber on the previous evening. The discussion then turned to the question of future compliance with the project's security rules and here there is a dispute as to what was said. Slipsager testified that Howton said that "he had no intention of complying with our rules and regulations." A written report by Slipsager dated August 31, quotes Howton as saying he did not "have to comply with any of our damned rules." Stormer testified in a slightly different vein, saying that Howton had told Slipsager what he could do with his rules, namely, "stick them up his ass." When asked for further details, Stormer said that Howton "said the only rules he had to adhere to was with B & W, the ones that signed his paycheck." On cross-examination Stormer testified that Howton had told Slipsager he would comply with the rules of his employer, Babcock & Wilcox. Howton, testifying in rebuttal, denied the remark attributed to him by Slipsager and testified he had told him "that I would comply with his rules and regulations."

Following this conversation Howton was given his badge and allowed to proceed to his job but Slipsager contacted Rickerd. Rickerd testified that he then conducted an investigation which included reading the Barber report and talking with Slipsager

and Stormer, Jerry Dean, a project engineer for Babcock & Wilcox, a registered nurse on the project who had had previous contact with Howton when he had been injured in a fall from a tower, and the president of the building trades union. He did not talk with Barber or Howton. He explained his omission to talk with Howton:

"I felt that if Mr. Dean or Mr. Slipsager or Mr. Stormer were not successful in discussing it with Mr. Howton, I didn't feel that I had any hopes of success either."

Neither Barber nor Dean testified at the trial or otherwise and the record does not disclose in what respect Dean had been unsuccessful in talking with Howton.

The contract between Basin and Babcock & Wilcox contains a section relating to "Rules of Jobsite." This section recognizes the right of the contractor to hire and fire and that the contractor will enforce both the owner's and the contractor's rules. It is further provided:

" * * * [I]n the event that an employee is observed by the Owner, Engineer or site security force to violate any of the following rules, the contractor shall be advised and the contractor shall inform the Owner and Engineer of the corrective action taken. *The Owner and Engineer reserves [sic] the right to require, for good cause, a contractor to bar any particular employee from working on the jobsite.*"

Included in the rules referred to is Rule No. 7, in pertinent part as follows:

"7. Badges issued by the security forces shall be worn conspicuously at all times while at the jobsite. * * * "

Rickerd testified that on the basis of his investigation he concluded that Howton was

" * * * indignant, arrogant, belligerent. He used abusive language not only to the guard but to the chief of security. He also indicated to Mr. Dean that he was not going to comply with our rules and regulations, and I felt I could not allow him to go back out on the site and relate to his fellow workers that he got

away with something, that he put it over on Basin Electric and the security guards."

He determined that "Howton's behavior the morning of August 31st and his attitude was [sic] not in the best interest of the owner" and on that same day wrote a letter to Babcock & Wilcox, reading in pertinent part:

"It has been determined that Mr. William Howton, Ironworker, employed by your firm has refused to comply with Basin Electric Power Cooperative rules and regulations established for the Laramie River Station. It is requested that Mr. Howton be terminated immediately."

■ In order to establish the claim of tortious interference with a contract the plaintiff must prove the following elements: (1) the existence of the contract; (2) defendant's knowledge of the contract; (3) intentional interference with plaintiff's contract without justification; and (4) resulting damages. *Kvenild v. Taylor,* supra, 594 P.2d at 977; *Francis Chevrolet Company v. General Motors Corporation,* 8th Cir., 602 F.2d 227, 230 (1979). Basin contends that Howton has failed to prove that Basin was not justified as a matter of law in recommending that Howton be fired. The "vital question in the case at bar is whether there was justification or excuse for the acts with which defendant is charged." *Carnes v. St. Paul Union Stockyards Co.,* 164 Minn. 457, 205 N.W. 630, 632 (1925).

In considering the question of interference with a contract this court has never attempted to define as a matter of law what constitutes reasonable justification for interference with a contract. *Wartensleben v. Willey,* supra; *Board of Trustees of Weston County School District No. 1, Weston County v. Holso,* supra; *Kvenild v. Taylor,* supra. Nor will we attempt to formulate any hard and fast definitions for the term in the case at bar. The term justification is broad and the question of whether there was an unjustified interference depends upon the facts of each case. However, as we stated in *Wartensleben,* 415 P.2d at 614,

" \* \* \* we still must concern ourselves with a determination as to whether defendants were *reasonably justified* in doing what they did \* \* \*." (Emphasis added.).

In considering the question of justification, the Supreme Court of Minnesota stated in *Carnes v. St. Paul Union Stockyards Co.,* supra, 205 N.W. at 632:

"The courts have not attempted to formulate a rule by which justification or lack of justification may be determined, but have said that in general the issue is largely one of fact for the jury; the standard being reasonable conduct under all the circumstances of the case."

In *Royal Realty Company v. Levin,* 244 Minn. 288, 69 N.W.2d 667, 673 (1955), the same court observed:

" \* \* \* We need not here concern ourselves with what constitutes sufficient justification. The term is not susceptible of any precise definition, and normally it is a question of fact for the jury's determination. In any event, the general view is that the burden of proving sufficient justification for the interference rests on the defendants."

As the jurisprudence is at this time, we are unable to come up with a definition of justification that can be mechanically applied in all cases, and we prefer, as did the Minnesota court, to leave it to the jury to determine this question on the facts of the particular case.

Section 766, Restatement of the Law of Torts (1939), cited in *Wartensleben,* stated that liability for purposeful interference with a contract will not arise if there was a privilege to act. A cause of action will arise if "one who, without a privilege to do so," induces another not to perform a contract. The authors of the second edition of Restatement of the Law of Torts (see introductory note to Ch. 37, p. 4, et seq., Vol. 4 (1979)) chose not to use the word privilege or justification in the revised § 766. They considered these terms to lack clarity and therefore not meaningful. Section 766 of the Second Restatement of the Law of Torts (1979) states that "[o]ne who inten-

tionally and improperly interferes with the performance of a contract \* \* \* is subject to liability \* \* \*." While we do not find this change of language particularly helpful in our inquiry, it still is consistent with the view that however the tort of interference is expressed—whether as conduct "without justification," "without privilege," or merely "improper"—the question is one of fact rather than one of law.

We also note that in the case at bar the right of the owner under the contract to require barring any employee from the jobsite is qualified by the phrase, "for good cause." Good cause, good faith, reasonable conduct, all appear to us to involve factual and not legal determinations. On this question of law versus fact, this remark in 4 Restatement of the Law of Torts, § 767, p. 38, comment 1 (1979), is pertinent:

" \* \* \* The analogy to negligence continues to hold in the situations where no recognized privilege has been formulated. Here [tortious interference with a contract], as with negligence, when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."

We therefore conclude that a fact question existed in this case requiring submission of the question to the jury. The jury was instructed as to the elements of the tort, including the requirement that for there to be recovery the action of Basin must have been without justification. The jury was told that it could find Basin justified in its action if it "in good faith is asserting a legally protected interest of the Defendant which the Defendant believes may be otherwise impaired or destroyed by the performance of the contract."

The key requirement imposed upon Basin was that it act in good faith and that was the whole issue which the jury had to try. That the defendant had a real and vital interest in security was established by testimony of Rickerd as to the amount of thiev-

ery that goes on in such a project. But the question whether the defendant was in good faith protecting that interest is not so easy. It is not disputed that there were harsh and perhaps unseemly words exchanged between the plaintiff and representatives of Basin. But there is a marked and distinct dispute as to whether plaintiff refused to comply with the jobsite rules. Slipsager's statement that plaintiff refused is somewhat weakened by Stormer's testimony that plaintiff said the only rules he would comply with were those of his own employer. It is difficult to see how plaintiff could comply with those rules and not those of the owner since the document signed by him, Jobsite Rules, does not state whether the rules were formulated by Basin or by Babcock & Wilcox. Moreover, and most importantly, plaintiff testified that he would abide by the rules, thus placing in dispute the question of whether he actually told the guards that he would not comply with Basin's rules. It should also be noted that Basin attempted to impeach Howton's testimony with his deposition that was given before the trial. However, the impeachment did not prevent the jury from accepting plaintiff's version of the incident.

Nor can we say that Rickerd acted in good faith when he recommended that Babcock & Wilcox fire Howton. While Rickerd conducted an investigation of the incident, he failed to discuss the matter with Howton. The jury could very well find that this omission raises the inference of bad faith.

Since the jury has found in favor of plaintiff, we must view the verdict as the jury's acceptance of plaintiff's version of the transaction, notwithstanding the evidence to the contrary. *Kahler v. Martin*, Wyo., 570 P.2d 720, 721 (1977). Upon the facts of this case we cannot say that the defendant has justified its conduct as a matter of law, and as we said in *Miller v. City of Lander*, Wyo., 453 P.2d 889, 893 (1969), "[w]e cannot, of course, substitute our judgment on the facts for the jury's."

Affirmed.