Eugene F. DEHNERT, Individually;
Dehnert, Richardson and Bensman,
Appellants (Defendants),

v.

ARROW SPRINKLERS, INC., a Utah
Corporation, Appellee (Plaintiff).

No. 84–142.

Supreme Court of Wyoming.

Aug. 29, 1985.

Rehearing Denied Oct. 16, 1985.

William F. Downes and J. Kenneth Barbe of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellants.

Donald P. White, Mark J. White and Janet E. Millard of White, White, Spurrier & Millard, Riverton, for appellee.

Ellen Crowley, Cheyenne, and Margaret Bates Ellison, Denver, Colo., for amicus curiae Wyoming Chapter of American Institute of Architects.

Before THOMAS,* C.J., and ROSE, ROONEY,** BROWN and CARDINE, JJ.

* Became Chief Justice January 1, 1985.

ROSE, Justice.

Architect Eugene F. Dehnert and the architectural firm of Dehnert, Richardson and Bensman appeal from the judgment entered on a jury verdict awarding $400,-000 in compensatory damages to appellee Arrow Sprinklers, Inc., upon its claim that appellants intentionally interfered with its landscaping and irrigation contract with Fremont County School District No. 1. We will hold that the evidence was insufficient to establish that appellants acted without justification in recommending that the school board terminate appellee's contract, and will, therefore, reverse the judgment of the district court.

## FACTS

Dehnert, Richardson and Bensman entered into a contract with Fremont County School District No. 1 on April 14, 1978 to study the district's educational facilities and requirements and to design and administer various construction projects. The contract obligated the architectural firm to advise and consult with the owner/school district during the construction phase, to inform the owner of the progress and quality of the work, and to "endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor." The architect had authority under the contract to issue certificates for payment to contractors when appropriate and to reject work which did not conform to construction specifications.

The contract authorized the architect to approve a contractor's proposals only for conformance with the design concept and with contract requirements:

"1.5.13 The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for conformance with the design concept of the Work and with the information given in the Contract Documents."

** Chief Justice at time of oral arguments.

Any changes in the work, other than minor adjustments, had to be approved by the school district pursuant to a formal change order:

"1.5.14 The Architect shall prepare Change Orders for the Owner's approval and execution in accordnace with the Contract Documents, and shall have authority to order minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents."

Appellant Dehnert represented the architectural firm in its performance of this contract.

The construction projects contemplated by this contract included the installation of sprinkler systems and landscaping for three elementary schools in Lander, Wyoming. Appellants hired the engineering firm of Nelson, Melius & Associates, P.C. to act as a consultant for these projects. Harold Diddle, a mechanical designer and employee of Nelson, Melius and Associates, actually prepared the performance specifications for the irrigation systems and the landscaping.

The documents distributed to potential bidders on these projects specified the use of brass sprinkler heads, known as "SAM" heads,[1] or an approved equal. Contractors wishing to submit bids on the basis of equipment other than that specified were required to obtain prior approval from the architect. A successful bidder who had not obtained prior approval to substitute materials could, according to the bidding documents, apply in writing for permission to do so:

"After execution of Contracts, should Contractor desire to substitute materials and/or methods not approved prior to bid opening, apply in writing for such permission stating:

"1. Cause for request with substantiating documents.

"2. Documentary proof of equal or superior quality.

"3. Delivery time.

"4. Costs in the form of certified quotations from suppliers of both specified and proposed materials.

"*Approved substitutions will be incorporated into the work by Change Order under conditions of the General Conditions.*" (Emphasis added.)

The General Conditions of the Contract for Construction, A/A Document A201, prepared by The American Institute of Architects and incorporated into the bidding documents, defines a change order as a written authorization from the owner and the architect to deviate from contract requirements:

"12.1.1 A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after execution of the Contract, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time."

Without obtaining prior approval pursuant to the bidding documents, appellee Arrow Sprinklers submitted a bid to the school board based on the use of a nonspecified, plastic sprinkler head, known as the "15103" head. At the bid opening on August 4, 1981, Calvin Bishop, president of Arrow Sprinklers, informed members of the school board that he intended to use the plastic sprinkler heads. The board awarded the construction contract to appellee as the low bidder on the project.

The agreement between the school district and Arrow Sprinklers, dated August 5, 1981, incorporated by reference the project specifications as well as the General Conditions of the Contract for Construction prepared by The American Institute of Architects. These General Conditions describe the roles of the owner, the architect, and the contractor, and include the architect's powers and duties as set out in the

---

**1.** Witnesses testified at trial that "SAM" indicates a stop-a-matic or seal-a-matic sprinkler head.

agreement between appellants and the school district.

On August 11, 1981, Calvin Bishop, representing appellee, and a consultant met with Harold Diddle who had prepared the specifications for the sprinkler system on behalf of appellants.[2] Appellee submitted to Diddle a letter proposing to use certain irrigation equipment, including the 15103 head. The letter referred to the proposed head by number only and contained no information as to its quality or cost. Appellee also presented to Diddle its blueprints or "layouts," listing the 15103 head in the legend, and some catalogs describing various sprinkler equipment. After Diddle and Bishop discussed the differences between the proposed sprinkler heads and the specified SAM heads, Diddle expressed his approval of the nonspecified plastic heads. Bishop and Diddle then presented the layouts and submittal letter to appellant Dehnert, who verbally approved the plans after eliciting Diddle's opinion that the proposed system would work.

On August 17, 1981, Dehnert advised appellee in writing of the architectural firm's conditional acceptance of the layouts:

"We are hereby accepting your lay-outs with any qualifications noted in the Specifications, as well as those noted on the attached letter."

The attached letter from the engineering firm noted certain minor items for revision, but contained no objection to the proposed plastic sprinkler heads. Bishop's submittal letter of August 11 was returned to him, bearing Diddle's notation that only the proposed pumps were rejected.

With its plans thus approved, Arrow Sprinklers began work on the landscaping project in late August. By early November, Dehnert had reported to the school board that the project was substantially complete and had certified payments to appellee representing 78 to 90 percent of the total contract price. In mid-November, however, a dispute developed between appellee and the architect concerning the fact that the installed sprinkler heads did not meet the specifications set out in the bidding documents. Appellants directed appellee to replace the heads, while appellee maintained that it had received prior written approval from the architectural firm to use the nonspecified equipment. As a result of Arrow Sprinklers' refusal to replace the disputed sprinkler heads, appellants eventually recommended to the school board that it terminate the construction contract. On April 14, 1982, the board notified appellee of its intent to cancel the contract unless the proper materials were supplied. Five months later, upon the architect's certification that sufficient cause existed, the board in fact terminated its contract with Arrow Sprinklers.

Appellee initiated this action against the architectural firm, Dehnert, the engineering firm and Harold Diddle on theories of negligence and intentional interference with a contractual relationship. The district court dismissed all claims sounding in negligence, and appellee subsequently settled its differences with the engineering firm and Diddle. The case against Dehnert and the architectural firm went to trial on appellee's claim of intentional interference with a contract. The jury found that appellants had intentionally and without justification interfered with Arrow Sprinklers' contract with the school district and awarded compensatory damages of $400,000. The trial court denied motions for a new trial and judgment notwithstanding the verdict, and Dehnert and the architectural firm perfected their appeal to this court. The Wyoming chapter of The American Institute of Architects has filed an amicus curiae brief in support of appellants.

2. Arrow Sprinklers initiated this meeting with Diddle in compliance with the following directive in the bid documents:

"Before work is started, this Contractor shall provide a complete system layout drawing for each site to be submitted to the Engineer along with shop drawings on equipment and materials to be installed. This drawing to provide complete coverage of area as normally considered acceptable practice for sprinkler systems."

Appellants frame the principal issue on appeal as follows:

"Is the evidence sufficient to support the jury's finding and verdict against appellants for intentional interference with appellee's contract."

## INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

We have recognized in prior cases the tort of intentional interference with contractual relations and have identified the following elements of such action:

(1) the existence of a valid contractual relationship;

(2) knowledge of the contractual relationship on the part of the interferor;

(3) intentional and improper interference inducing or otherwise causing a breach or termination of the relationship; and

(4) resultant damage to the party whose relationship has been disrupted.

*Kvenild v. Lavoie*, Wyo., 594 P.2d 972 (1979); *Board of Trustees of Weston County School District No. 1 v. Holso*, Wyo., 584 P.2d 1009, reh. denied 587 P.2d 203 (1978). We have said that no liability attaches where an individual, charged with protecting the interests of a third person, justifiably acts to cause that person not to perform a contract. *Kvenild v. Lavoie*, supra; *Basin Electric Power Cooperative-Missouri Basin Power Project v. Howton*, Wyo., 603 P.2d 402 (1979). In *Kvenild v. Lavoie*, we overturned a judgment in favor of plaintiffs who alleged that the defendants/real estate agents had tortiously interfered with their contractual rights to buy certain real property. We held that the defendants had a duty to protect the seller's interests and were justified in their intervention:

" * * * The defendants cannot be held liable * * * because they stood in a relationship of responsibility to [the seller]. They were not strangers to the contract. They were agents protecting the interests of their principal. * * * The record can only support a finding that defendants were privileged to advise [the seller] to enter into the contract for sale with McMillan, and they were justified in doing so in view of the [plaintiffs'] equivocation and delay in consummating of the oral arrangement they had with [the seller]." 594 P.2d at 977.

See also *Wartensleben v. Willey*, Wyo., 415 P.2d 613 (1966); *Tye v. Finkelstein*, 160 F.Supp. 666 (D.Mass.1958); Prosser and Keeton, The Law of Torts § 129, p. 985 (5th Ed., 1984); Restatement of the Law 2d, Torts § 770.

Like the real estate agent, the architect acting in his professional capacity typically is bound by contract to guard the interests of his principal. An architect who acts within the scope of his contractual obligations to the owner will not be liable for advising the owner to terminate a contractor's performance unless the architect acts with malice or in bad faith. *Ballou v. Basic Construction Company*, 407 F.2d 1137 (4th Cir.1969); *Lundgren v. Freeman*, 307 F.2d 104 (9th Cir.1962); *Craviolini v. Scholer & Fuller Associated Architects*, 89 Ariz. 24, 357 P.2d 611 (1961); *Kecko Piping Company, Inc. v. Town of Monroe*, 172 Conn. 197, 374 A.2d 179 (1977). In his treaties, Legal Aspects of Architecture, Engineering and the Construction Process, 2d Ed., Justin Sweet explains the concept of an architect's privilege to intervene in the contractual relationship between the owner and the contractor:

" * * * [I]nterference is not wrongful if it is privileged. * * * Privilege can be created by the relationship between owner and design professional. Also, it can be created by contract clauses either giving the design professional the right to terminate or allowing the owner to terminate upon certification by the design professional that adequate cause for termination exists. The privilege is granted to enable the owner to be advised honestly without the risk of the person giving advice being taken to court.

"The privilege, whether conferred by law or by contract, must not be abused. If the interference with the contractor's rights were motivated by malice or bad

faith, the design professional would be liable for any pecuniary loss caused the contractor." Section 27.10, pp. 536–537. A showing of malice or bad faith, not negligence, poor judgment or inflexibility, is essential if the contractor is to recover from the architect for contract interference. *Ballou v. Basic Construction Company*, 407 F.2d at 1141.

In light of the foregoing authority, the question for our resolution is whether the evidence was sufficient to establish that architect Dehnert and his firm acted with malice or bad faith—that is, acted without justification—in causing the school board to terminate the district's construction contract with Arrow Sprinklers. · Appellee, at trial and before this court, claims that appellants exhibited bad faith in that they approved the nonspecified sprinkler heads and allowed construction to proceed, but disavowed that approval and recommended cancelation of the contract when the school board objected to the plastic sprinklers. Rather than admit their authorization of the use of equipment unacceptable to the board, appellants, according to appellee, maliciously urged termination of the construction contract on the ground that Arrow Sprinklers had failed to follow specifications.

 We are mindful that, where sufficiency of the evidence is an issue on appeal, we assume that the evidence of the successful party is true and leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith. *Krist v. Aetna Casualty & Surety*, Wyo., 667 P.2d 665 (1983). We give to the evidence of the successful party every favorable inference which reasonably may be drawn from it. *Farella v. Rumney*, Wyo., 649 P.2d 185 (1982). We will sustain the findings of the trial court unless clearly erroneous or contrary to the great weight of evidence. *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo., 577 P.2d 991 (1978). However, findings and judgments which are unsupported by the evidence, contrary to the evidence or against the great weight

of evidence cannot stand. *Kvenild v. Lavoie*, supra.

In the instant case, the uncontradicted evidence establishes that appellee did not abide by the contract procedures in seeking to substitute the nonspecified sprinkler heads. Instead of proceeding pursuant to a change order signed by the school board, appellee installed the plastic heads on the basis of the architect's conditional approval of layouts.

It is true that appellee, in obtaining approval of its layouts, informed the architect and engineer of its intent to use nonspecified equipment. However, the information supplied by appellee in this connection was inadequate for purposes of initiating the change order necessary for the substitution of the plastic heads. Appellee did not furnish documentation that the quality of the proposed sprinkler head equaled or exceeded that of the specified head. Nor did appellee provide cost quotations or substantiate in writing its reasons for requesting the changes. These data, required by the contract documents in support of a request to deviate from specifications, would have enabled appellants to make an informed decision as to whether to prepare a change order for the school district's approval.

 The blueprints and limited information supplied by Arrow Sprinklers apparently sufficed to permit appellants to approve the plans for conformance with the design concept. This preliminary approval, pursuant to the contract documents, cannot be construed as a waiver of the additional contractual requirement that the contractor obtain a change order for the substitution of major equipment. See *Acmat Corporation v. Daniel O'Connell's Sons, Inc.*, 17 Mass.App. 44, 455 N.E.2d 652 (1983). Therefore, neither the architect's verbal approval of the substitution at the August 11th meeting, nor appellants' subsequent conditional approval in writing of appellee's layouts, was effective to authorize the installation of the nonspecified sprinkler heads.

Appellants had a contractual duty to reject nonconforming work and generally to advise and protect the school district with respect to the landscaping and irrigation projects. Acting in this capacity, appellants rejected the sprinkler heads which did not meet contract specifications and which appellee had installed without proper authorization. When Arrow Sprinklers refused to replace the rejected heads,[3] appellants advised the school board to terminate the construction contract. Appellants acted within the scope of their authority and based their recommendation on permissible factors under the contract documents. Therefore, their conduct was justified and they cannot be held liable for interfering with appellee's contract with the school district. Dehnert's failure to reject the plastic heads at the outset and his resolution of the resulting impasse may reflect negligence and poor judgment, but such conduct does not amount to the malice or bad faith necessary to hold appellants liable.

Our disposition of this appeal renders unnecessary any consideration of appellants' questions concerning the duty to mitigate damages and the right of a foreign corporation to maintain an action in the courts of this state.

We reverse the judgment of the district court and remand this case for the entry of a judgment consistent with this opinion.

CARDINE, Justice, dissenting, with whom BROWN, Justice, joins.

I dissent.

The question presented by this case was whether the defendants, in causing the cancellation of plaintiff's contract, were merely negligent or had acted in bad faith. There was a trial to a jury. Numerous witnesses were called and testified. The jurors heard their testimony, judged their demeanor, determined their credibility and the weight to be given their testimony. There were no objections to instructions in this area, and it must be assumed that the trial judge correctly instructed the jury upon the law. The jury determined that the defendants had acted in bad faith in causing the termination of the contract and that plaintiff should recover the damages suffered. We have said that the trier of fact

"at the trial heard and saw the witnesses. [It] is in the best position to determine questions of credibility and weigh and judge the evidence, both expert and non-expert. Thus, on appeal, it is a firmly established and oft-stated rule that we must accept the evidence of the successful party as true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference that may fairly and reasonably be drawn from it. Considering the evidence in this case in the light of these rules, it is apparent that the findings and judgment of the trial court must be sustained unless clearly erroneous or contrary to the great weight of evidence." *Sowerwine v. Nielson*, Wyo., 671 P.2d 295, 301 (1983). See also, *Anderson v. Bauer*, Wyo., 681 P.2d 1316 (1984), and *Grosskopf v. Grosskopf*, Wyo., 677 P.2d 814 (1984).

Thus,

"as an appellate court, we must examine the evidence in a light most favorable to the prevailing party and resolve all conflicts in the testimony and exhibits in his favor. Unless clearly erroneous, we will not disturb the findings of the trial court on appeal." *Scott v. Fagan*, Wyo., 684 P.2d 805, 809 (1984).

**3.** The General Conditions of the Contract for Construction direct the contractor to promptly correct nonconforming work, regardless of the time of discovery:

"13.2.1 The Contractor shall promptly correct all Work rejected by the Architect as defective or as failing to conform to the Contract Documents whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear all costs of correcting such rejected Work, including compensation for the Architect's additional services made necessary thereby."

If the judgment is sustainable on any basis or valid ground appearing in the record, it must be affirmed. *Valentine v. Ormsbee Exploration Corp.*, Wyo., 665 P.2d 452 (1983), and *Agar v. Kysar*, Wyo., 628 P.2d 1350 (1981).

Viewing the evidence in a light most favorable to plaintiff, as I must, I find that appellants contracted with the school board to provide full architectural services including landscaping and sprinkler design. Appellants employed an engineering firm as its agent to write the specifications for the sprinkler project. In its bid, because of an inadequate water supply, appellee specified a sprinkler head different from the specifications. At the bid opening, appellee's bid was $55,000 lower than the next low bid. Appellants were concerned about the bid being so much below the next low bid. A school board member inquired and appellee advised, in appellants' presence, that it had, in its bid, used sprinkler heads different than those specified. The bid was accepted. Appellee submitted five sets of detailed plans to appellants and their engineer. Appellants reviewed and approved the plans including specifically the plastic sprinkler heads. Appellee installed the sprinkler system according to the plans submitted and which were approved by appellants. Appellants reported to the school board that the system was substantially complete, authorized payment of all but ten percent retainage to be withheld for the one-year warranty period.

Ten days after approval, a school board trustee called appellants' office inquiring why the different sprinkler heads had been installed. Appellants did not admit that they and their engineer had approved the initial bid, the sprinkler heads, the plans for installation, had inspected the installation and approved payment of ninety percent of the contract price, but instead stopped payment to appellee and advised the school board to terminate appellee's contract. In the words of appellee:

"Appellant, rather than admit the prior approval and reveal to the School Board that he had exaggerated his familiarity with sprinkler work, embarked on a course of conduct deliberately calculated to shift the consequences of his mistake or lack of knowledge to Appellee. He succeeded in delaying the project, stopping payment to appellee for approximately two years thereby causing substantial damage to Appellee. His success in delaying the project was predicated, among other things, upon a blatant lie to an attorney to secure a legal opinion to present to his client bolstering his position to demand replacement of the installed sprinkler heads."

Appellants' counsel during oral arguments conceded that had it been established that appellants acted in bad faith in this controversy, appellee would be entitled to recover its damages. Upon the facts of this case, I see the question of bad faith as one for the jury's determination. The jury, after hearing conflicting evidence, found that appellants acted in bad faith and awarded damages to appellee. There was substantial evidence to support the finding, and I would, therefore, affirm the jury's verdict and the judgment of the trial court.