John DYNAN, Appellant (Plaintiff),

v.

ROCKY MOUNTAIN FEDERAL SAVINGS AND LOAN; Rocky Mountain Capital Corporation; and Bill Lucas, Appellees (Defendants).

No. 89–92.

Supreme Court of Wyoming.

May 8, 1990.

Harold F. Buck and Nicholas Vassallo, Buck & Lewis, Cheyenne, for appellant.

George E. Powers, Jr., Godfrey & Sundahl, Cheyenne, for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

THOMAS, Justice.

The focus of this case is upon the question of whether a claim for wrongful discharge by an officer of a federal savings and loan institution appropriately is foreclosed by summary judgment on the ground that any genuine issues of fact lack materiality because of the preemptive effect of federal law. Two collateral issues are injected into this major theme. The first of those is whether the termination of employment must be held to be wrongful because it was contrary to public policy. The second is whether the individual who terminated the employment, also an officer and employee of the federal savings and loan institution, can be liable for tortious interference with a contract or prospective economic advantage. The trial court granted the motion for summary judgment presented by the federal savings and loan institution, essentially ruling that any issues of fact were not material because of the preemptive effect of federal law. It also held that there was no violation of public policy, as a matter of law, and invoked the rule that an agent is not liable for tortious interference with a contract with his principal. To the extent that the trial judge relied upon absolute federal preemption in this case, we are not in accord with his interpretation of the law, but we agree that, in the circumstances of this case, the employment contract was an employment at will as a matter of law and, therefore, any issues of fact relating to cause for termination are not material. We also agree that there was no violation of any public policy as a matter of law, and

that an agent, an employee of a corporation, is not liable for tortious interference with a contract or prospective economic advantage relating to an employment contract made with his principal. We also are in accord with the trial court's disposition of an additional procedural question relating to the propriety of the denial of a motion to amend the complaint with respect to allegations of fraud. We affirm the summary judgment entered by the trial court, but justify that disposition in a somewhat different fashion.

In his Brief of Appellant, John Dynan (Dynan), the discharged employee, states only a single issue which is:

"Whether the district court erred in granting summary judgment in favor of appellees."

Dynan expands upon the single issue in his argument by asserting the following contentions:

"A. The evidence before the district court presented genuine issues of material fact concerning appellant's breach of contract claim and appellees were not entitled to summary judgment on that claim as a matter of law.

"B. The district court erred in granting summary judgment on appellant's claim of termination against public policy.

"C. The district court erred in denying appellant's motion for leave to amend his complaint.

"D. The record presents genuine issues of material fact on appellant's claim of tortious interference with a contract or prospective economic advantage."

In their Brief of Appellees, Rocky Mountain Federal Savings and Loan (RMF), Rocky Mountain Capital Corporation (RMC), and Bill Lucas (Lucas) restate the issues, as they perceive them, in this way:

"I. Are there any issues of material fact which would preclude the district court from entering summary judgment against plaintiff's claims for breach of contract?

"A. Are plaintiff's claims for breach of contract under state law preempted by the rules of the Federal Home Loan Bank Board?

"B. Did the plaintiff raise an issue of material fact with respect to his status as a probationary employee based upon submission of evidence that would be admissible at trial?

"II. Are there any material facts in dispute which would support plaintiff's recovery based upon a cause of action for termination against public policy?

"III. Did the district court abuse its discretion in denying plaintiff leave to amend his complaint?

"IV. Are there any issues of material fact which would preclude the district court from entering summary judgment with respect to plaintiff's claims for tortious interference with contract or prospective economic advantage?"

The operative facts, as they are gleaned from the record submitted to the district court both in support of and in opposition to motions for summary judgment by both parties, start with Dynan's employment at Barclay's Mortgage Corporation in Colorado. While so employed, he was contacted by Executive Resources, an employee recruiting firm, with respect to a possible position with the Wyoming division of RMF. This contact led to meetings with various officers and executives from RMF, and he was offered employment with that firm. Dynan accepted that offer on June 11, 1985 and was appointed a vice president of RMF on June 26, 1985. At the same time, he also was made an officer of RMC, which is a wholly owned subsidiary of RMF.

There is no discrete writing that demonstrates the details of Dynan's employment. At the time he was hired, he was advised of certain personnel policies that applied to all employees of RMF. Among these policies was a ninety-day probationary term during which a new employee could be terminated without cause. The probationary term extended to 180 days in the case of management positions. Dynan, by deposition, testified that he requested a waiver of this probationary period because he was leaving a secure job to work for RMF. He testified that an officer of RMF agreed to this request, but that allegation was directly controverted by deposition testimony of the officer whom Dynan asserts agreed to the waiver, another officer of RMF, and Lucas.

Dynan also testified that he accepted the position with RMF, and worked in that position, pursuant to the terms of the employee handbook. That handbook, in addition to the probationary periods described previously, provides in part as follows:

"PROGRESSIVE DISCIPLINE

"Discipline is defined as training that develops self control and character. It is necessary for the orderly and efficient operation of any organization. Because of the need for orderliness and self control, certain rules and regulations contained in this handbook have been developed and others may be issued from time to time so that we know what is expected in our relationships with one another and toward our customers.

"There are some things which cannot be condoned. Theft of Association or employee property, willful destruction of Association or employee property, fighting, using nonprescribed narcotics, being intoxicated while on the job, sleeping on the job, gross misconduct and gross negligence are things that can result in immediate suspension or discharge.

"Occasionally, an employee may fall into poor personal or work habits. Counselling by the supervisor usually will be enough, but if counselling fails, a disciplinary procedure may be necessary, and if necessary. . . .

"*First Step:* The employee will be orally notified by the supervisor of the problem. The supervisor will work with the employee to correct the problem. If the employee continues without improvement, the supervisor will go to the next step.

"*Second Step:* The employee will be given a written reprimand by the immediate supervisor, and that reprimand becomes a part of the employee's record. If the employee continues without improvement, the supervisor will use the next step.

"*Third Step:* The employee will be suspended without pay for a period not to

exceed three work days. * * * If * * * the employee still makes no improvement, the supervisor will resort to the final step.

*"Final Step:* The Employee will be discharged. * * * An employee subjected to the discipline procedure, who feels unfairly treated, has a right to the full use of the company's grievance procedure. Depending upon the seriousness of a problem or in cases of chronic offenders, the steps in this disciplinary procedure may be bypassed resulting in immediate termination."

The depositions in the file indicate that RMF had a reputation within the savings and loan industry for producing "poor quality loans" and that Dynan's primary duty with the firm, and the reason for which he was hired, was to alleviate this problem. Dynan stated that he was "essentially given carte blanche to straighten out the mess." Dynan's understanding is given additional support by the deposition testimony of the senior vice president of RMF, whom Dynan asserted had agreed to waive the probationary term. Dynan proceeded to accomplish his duties in accordance with that understanding of his assignment, and he attempted to implement a policy of strict adherence to National Standards for Loan Underwriting in lieu of the existing corporate policy with respect to making loans. According to Dynan, however, the controlling management of RMF was content with the existing loan policy and resisted changes that he proposed. He testified that this attitude was demonstrated by several "questionable" loans, one of which was the Steve Rosen loan that ultimately, according to Dynan, led to his dismissal.

In the spring of 1985, Rosen, a resident of Colorado, contacted RMF with respect to a home loan in the amount of $175,000. He was referred to a Colorado employee who, apparently, committed the firm to a loan in this amount. Rosen, acting upon what he perceived to be a commitment, obtained a bridge loan from another source and proceeded to close his home purchase. Because of its size, the loan that he had requested would not qualify for normal marketing procedures carried out under the Federal National Mortgage Act or Federal Home Loan Mortgage Corporation guidelines. When this problem was brought to the attention of a vice president of RMC, that officer decided that the best plan was to place the loan on the secondary market where, hopefully, a private investor could be found to purchase it. If this did not occur, the only alternative, assuming that the commitment was to be honored, was for RMF to carry the loan in its own portfolio.

The management at RMF was agreeable to the latter resolution, but Dynan was not. He believed that the loan was questionable and should not be approved unless an investor could be found on the secondary market. This difference in opinion matured on August 14, 1985 when Rosen telephoned Dynan to ask about the status of his loan. Dynan advised him that the loan could not be extended under the existing circumstances. Dynan testified that Rosen became irate and advised him that he, Rosen, was a friend of Lucas and would see to it that Dynan was fired for refusing the loan. Rosen then did telephone Lucas and did discuss the situation directly with him.

Dynan alleges that the telephone call coupled with his reluctance to approve the questionable Rosen loan precipitated his discharge. In his deposition, Rosen denied making any such threats, and RMF asserts that Dynan's termination was due to other reasons and was not the result of any conflict regarding the Rosen loan. The record does disclose that Lucas confronted Dynan and discharged him soon after the Rosen telephone call to Lucas.

Dynan brought this suit against RMF, Lucas, and Rosen alleging breach of contract, termination against public policy, fraud, libel and slander, and a claim of intentional interference with a contract or prospective economic advantage. He asserted damages resulting from loss of reputation, lost wages, and emotional distress. He also included a demand for exemplary, or punitive, damages against all defendants. Subsequently, a stipulation was entered into that resulted in all claims against

Rosen being withdrawn, and Rosen was dismissed from the case. Even though RMF contended that its employee handbook did not prescribe any terms and conditions of Dynan's employment, it asserted that he could be terminated without cause because he was discharged within the probationary term described in the employee handbook. That essentially was a fall back position for RMF because its primary contention was that Dynan's employment was an employment at will as a matter of federal regulatory law, which RMF asserts preempts the application of any rules of state law.

After discovery, the remaining defendants moved for summary judgment on all remaining issues. At the same time, Dynan filed a motion for a partial summary judgment on the issue of breach of contract. Not long after that, Dynan withdrew his claims of libel and slander. At the hearing on all pending motions, including those for summary judgment, Dynan made an oral motion to the court for leave to amend his complaint to include allegations that RMF and Lucas induced him to accept employment by false promises of job security through the use of the employee handbook and that he relied on those false promises to his detriment. That hearing was not reported. On February 28, 1989, the district court entered its order denying Dynan's motions and granting the motions of RMF and Lucas for summary judgment. This appeal is taken from that order.

Dynan's primary contention is that the materials furnished to the district court with respect to his claims of breach of contract demonstrate genuine issues of material fact and that RMF and Lucas were not entitled to summary judgment as a matter of law. The factual issues asserted relate to whether the probationary period was waived and whether the RMF employee handbook, with its sequential discipline provisions leading to termination, constituted an employment contract that should have been applied in this instance. RMF and Lucas contend that these asserted factual issues are not material because, as a matter of federal regulatory law relating to the savings and loan industry, Dynan

was an employee at will and subject to termination at any time without cause. *See Berry v. American Federal Savings*, 730 P.2d 905 (Colo.App.1986). They then argue that, by virtue of the employment at will, they are free from any liability to Dynan. *See Siebken v. Town of Wheatland*, 700 P.2d 1236 (Wyo.1985); *Allen v. Safeway Stores, Inc.*, 699 P.2d 277 (Wyo. 1985). We recognize as legally correct the claim of RMF and Lucas that even genuine issues of fact are immaterial if those issues have no relevance in light of a controlling rule of law.

The resolution of these opposing arguments requires a consideration of whether rules of state law are preempted by federal law in this context and, if so, whether that preemption leads to a conclusion that an officer employed in the savings and loan industry is an employee at will under all circumstances. We begin with the fundamental principle that the Supremacy Clause of the Constitution of the United States, art. VI, cl. 2, invalidates all state laws that either " 'interfere with or are contrary to' federal law." *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985), quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 22 U.S. 1, 6 L.Ed. 23 (1824). There is more than one way in which the doctrine of preemption can be demonstrated. The most direct method is for Congress to establish federal preemption by stating its intention to do so in express terms. *Hillsborough; Jones v. Rath Packing Company*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604, *reh. denied* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977). If that demonstration of intention is not present, preemption can be inferred when the scheme of federal regulation so comprehensively pervades the area of law that no room is left for supplementary state regulation. *Hillsborough; Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Federal preemption also will be inferred where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the

same subject." *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152.

If preemption is determined to be present, "state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough*, 471 U.S. at 712, 105 S.Ct. at 2375. "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,'" *Hillsborough*, 471 U.S. at 712, 105 S.Ct. at 2375, quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248, *reh. denied* 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963), "or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough*, 471 U.S. at 712, 105 S.Ct. at 2375.

■ Congress has not expressly articulated preemption in the area of employment practices in the savings and loan industry. It has, however, manifested its intention to empower a regulatory board, the Federal Home Loan Bank Board (Board), with requisite authority to promulgate regulations concerning the savings and loan industry. *See Berry*, 730 P.2d 905. Section 5(a) of the Homeowners Loan Act, 12 U.S.C. § 1464(a) (1989 Supp.), provides:

> "In order to provide thrift institutions for the deposit or investment of funds and for the extension of credit for homes and other goods and services, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations, or Federal savings banks, and to issue charters therefor, giving primary consideration to the best practices of thrift institutions in the United States."

The Board has invoked this authority and promulgated regulations expressly evidencing an intent to control the savings and loan industry to the degree that there is no opportunity for state regulation. Title 12 C.F.R. § 545.2 (1989) provides:

> "Sec. 545.2 *Federal preemption.*
>
> "The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association."

As is true of federal statutes, properly promulgated federal regulations preempt state law, and our Wyoming law, if contrary to such regulations, has no effect. *See Hillsborough, Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *U.S. v. Shimer*, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961); *People of State of California v. Coast Federal Savings and Loan Association*, 98 F.Supp. 311 (S.D.Cal.1951). *See also Cole v. Cartaret Savings Bank, P.A.*, 540 A.2d 923 (N.J.Super.L.1988). There is no denial of the proposition that pursuant to 12 C.F.R. § 545.2, the Federal Home Loan Bank Board regulations covered "all aspects of every federal savings and loan association from its cradle to its corporate grave." *People*, 98 F.Supp. at 316. There is no disagreement in this case that RMF is a federal savings and loan association subject to the rules promulgated by the Board.

RMF and Lucas invoke 12 C.F.R. § 544.5(b)(11)(b) (1989) to establish that Dynan was an employee at will. The cited provision provides:

> "(b) The following requirements are applicable to Federal mutual associations:
>
> \*   \*   \*   \*   \*   \*
>
> "11. *Powers of the Board.* The board of directors [trustees] shall have the power.
>
> \*   \*   \*   \*   \*   \*
>
> "(b) To fix the compensation of directors [trustees], officers, and employees; and to remove any officer or employee at any time with or without cause; \* \* \*."

Standing alone, this regulation indicates that Dynan was an employee at will subject

to removal by the board of directors of RMF. It also implies, if construed in accord with our Wyoming precedent, that any such removal would result in no liability to Dynan. *See Siebken,* 700 P.2d 1236; *Allen,* 699 P.2d 277; *Rompf v. John Q. Hammons Hotels, Inc.,* 685 P.2d 25 (Wyo.1984); *Lukens v. Goit,* 430 P.2d 607 (Wyo.1967); *Long v. Forbes,* 58 Wyo. 533, 136 P.2d 242, 158 A.L.R. 224 (1943).

In addition, RMF and Lucas direct our attention to 12 C.F.R. §§ 545.122 and 563.-39, providing:

"12 C.F.R. § 545.122

"A Federal association, upon specific approval of its board of directors, may enter into employment contracts with its officers and other employees in accordance with § 563.39 of this chapter.

"12 C.F.R. § 563.39

"(a) *General.* An insured institution may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section. All employment contracts shall be in writing and shall be approved specifically by the institution's board of directors. An institution shall not enter into an employment contract with any of its officers or their employees if such contract would constitute an unsafe or unsound practice. The making of such an employment contract would be an unsafe or unsound practice if such contract would lead to material financial loss or damage to the institution or could interfere materially with the exercise by the members of its board of directors of their duty or discretion provided by law, charter, bylaw or regulation as to the employment or termination of employment of an officer or employee of the institution.

"(b) *Required provisions.* Each employment contract shall provide that:

"(1) The institution's board of directors may terminate the officer or employee's employment at any time, but any termination by the institution's board of directors other than termination for cause, shall not prejudice the officer or employee's right to compensation or other benefits under the contract. The officer or employee shall have no right to compensation or other benefits for any period after termination for cause. Termination for cause shall include * * *."

RMF and Lucas assert that these provisions also support the trial court's ruling that, as a matter of law, Dynan was an employee at will.

We are not so certain that these provisions manifest a federal rule that an employee, such as Dynan, is, without exception, an employee at will. They do not serve to demonstrate that a termination without cause can be effected without liability in the usual context of the rights of an employer in an employment at will. A federally regulated institution, with the approval of its board of directors, may enter into contracts defining the terms of employment. Such contracts conceptually can include procedures for discharge, and the institution may be liable for compensation or other benefits under the contracts in the event of a termination without cause. The result is that an employment under such a contract is not an employment at will in the classic sense, notwithstanding the provision of the federal regulations that an employee can be terminated at any time. Liability, or the absence of liability, as a consequence of discharge is the real question in this case. The question is not whether Dynan can be terminated at any time, but whether, if he is terminated, there is no financial liability on the part of the appellees.

We recognize an ambiguity within these federal regulations. They appear to authorize termination without cause, but in another place, they say that termination without cause shall not prejudice the employee's contractual rights to compensation or other benefits. Recognition of this ambiguity constitutes an application of state law, but we do not perceive a problem with respect to federal preemption in this instance because our resolution is compatible with the federal regulations. *See Hillsborough,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714. Our application of state law does not conflict with the federal regulatory scheme. A different resolution than the one we invoke would require a change

in either the federal statute or the federal regulation, which does not come within our province.

■ We still must support the determination of the district court, however. Dynan's employment was not an employment at will foreclosing liability for termination without cause as a matter of federal pre-emption, but we must still determine whether the termination was permissible in accordance with state law. Both parties, in varying degree, rely upon the personnel handbook of RMF. There is no question that the employment handbook contained a ninety-day probationary term for all employees, which was extended to 180 days for management positions. Dynan was terminated within the ninety-day period and, unless there was a valid waiver of that provision of his employment contract, his termination without cause was not wrongful.

At this juncture, we are required to return to the federal regulations because, while our rules of state law might justify an oral waiver of the probation in the employee's personnel manual, that rule could not control if in conflict with a provision of the federal regulations. Title 12 C.F.R. § 563.39 speaks directly to this situation. It provides, in pertinent part:

"(a) *General.* An insured institution may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section. *All employment contracts shall be in writing and shall be approved specifically by the institution's board of directors.*" (Emphasis supplied.)

There is nothing in the record that would serve to demonstrate a written waiver of the probationary term. We are constrained to apply that requirement of the federal regulation, and the result is that Dynan could not establish a lawful and valid waiver of the probationary term at trial. The consequence is that invocation of the contractual terms, upon which Dynan relies in part, demonstrates that there is no genuine issue of material fact with respect to whether Dynan's discharge without cause is permitted by the contract. The employment relationship is a classic employment at will under Wyoming law, and no liability flows for the termination itself.

■ Dynan urges very strongly, however, that the trial court erred in granting summary judgment because of his claim that the termination of the employment contract, if it was an employment at will, was contrary to public policy. Dynan's claim is that he was terminated because he refused to approve the Rosen loan, a loan that, in his judgment, was "bad" and could end up costing RMF and, ultimately, the public because savings and loan losses are underwritten by a federally sponsored insurance program. Dynan cites 12 C.F.R. § 563.17 for the proposition that it is contrary to public policy for such federally chartered savings and loan institutions to make unsound loans. He argues that his discharge, under the circumstances that he alleges, is contrary to public policy because terminations for failure to approve loans that are bad, in the judgment of the employee, chills his commitment to act in the best interests of his employer and the public. The employee might well prefer maintaining his job to acting in the best interests of the institution or others. See *Cummins v. EG & G Sealol, Inc.,* 690 F.Supp. 134 (D.R.I.1988).

RMF and Lucas concede that a cause of action against an employer for termination of an employment at will contract in violation of public policy may lie. *See Allen,* 699 P.2d 277. Their response to Dynan's claim is the allegation that his discharge was not contrary to public policy and that, as a matter of fact, he was not discharged for refusing to approve the Rosen loan. The position of RMF and Lucas is that the Rosen transaction was merely the culmination of an ongoing dispute over professional judgment. They imply that Dynan, in fact, was terminated for other unstated reasons. At a superficial level, this dispute might well demonstrate a genuine issue of material fact with respect to whether Dynan was terminated in violation of a valid public policy and, thus, preclude summary judgment.

■ This court has said, however, quoting with approval from *Wehr v. Burroughs Corporation*, 438 F.Supp. 1052, 1055 (E.D. Pa.1977):

" 'It is clear then that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of the public policy exception requires two factors: (1) that the discharge violate some well-established public policy; and (2) that there be no remedy to protect the interest of the aggrieved employee or society.' " *Allen*, 699 P.2d at 284.

We perceive these factors to be sequential. First the "well-established public policy" must be demonstrated, and, if it is, then the court must consider whether another remedy can be found. The first element that Dynan must demonstrate is that the discharge did, in fact, violate some "well-established public policy." *Allen*. The absence of this element is the foundation for the flaw in Dynan's claim. "Generally, the specific expression of public policy arises from well-established legislative, judicial, or administrative mandate." *Cummins*, 690 F.Supp. at 138. The federal regulations completely govern the federal savings and loan industry, and their mandates, therefore, articulate the parameters of public policy within the industry according to the intent of Congress. The loan policies of the member firms in this industry are regulated and scrutinized. See 12 U.S.C. § 1464. Public policy does not depend upon the protection of the industry by the unfettered judgment of employees of firms in the industry. The parameters also include employment practices and employee termination, and the regulations permit discharge without cause. Protection of the public policy interests well may depend as much upon the power to terminate an ineffective or injudicious employee without cause as upon the unfettered judgment of an employee. This reasoning leads to the conclusion that it is not against public policy to act in accordance with the regulations. For that reason, we are unable to conclude that Dynan's discharge was contrary to public policy. The summary judgment in favor of RMF and Lucas on this claim must be affirmed.

■ Dynan next contends that the district court erred in denying him leave to amend his complaint. A decision such as that is discretionary with the court, however, and we do not disturb that ruling in the absence of clear evidence that there was an abuse of discretion. *Bush v. Duff*, 754 P.2d 159 (Wyo.1988); *Elder v. Jones*, 608 P.2d 654 (Wyo.1980); *Rose v. Rose*, 576 P.2d 458 (Wyo.1978); *Breazeale v. Radich*, 500 P.2d 74 (Wyo.1972). The responsibility for presenting that evidence is assigned to Dynan. In this instance, he provides nothing to support his claim. His motion was an oral motion, and there is no written document for us to analyze. The hearing at which it was made was not reported, and we have no way of scrutinizing the reasons the district court may have invoked for its refusal of the motion. We have no way of weighing the question of the abuse of discretion in this case and, in the absence of a showing that would assist us in this regard, the denial of the motion by the district court must be affirmed.

As a final matter, we turn to Dynan's contention that the record does show genuine issues of material fact with respect to his claim of tortious interference with his contract or prospective economic advantage. When he presented this claim to the lower court, Dynan focused on the motivation of Lucas for discharging him, including allegations that Lucas acted out of personal gain. Without presenting tangible evidence of such conduct, however, Dynan goes directly to the conclusion that a mere finding of questionable motive supports the claim. He also alleged that Lucas acted beyond the scope of Lucas' employment in discharging him. Dynan refers us to no supportive authority, but he now attempts to persuade the court that unresolved questions surrounding these allegations present genuine issues of material fact.

The following elements must be demonstrated to sustain a cause of action for tortious interference with a contract or prospective economic advantage:

"(1) the existence of a valid contractual relationship;

"(2) knowledge of the relationship on the part of the interferor;

"(3) intentional and improper interference inducing or otherwise causing a breach of termination of the relationship; and

"(4) resultant damage to the party whose relationship has been disrupted."

*Dehnert v. Arrow Sprinklers, Inc.*, 705 P.2d 846, 850 (Wyo.1985); *Kvenild v. Taylor*, 594 P.2d 972 (1979); *Board of Trustees of Weston County School District No. 1 v. Holso*, 584 P.2d 1009, *reh. denied* 587 P.2d 203 (Wyo.1978). The third element is the critical one in this case because it demands that the plaintiff demonstrate that the defendant's actions were both intentional and improper. Without offering an explanation, the district court ruled that Lucas' actions were not improper. Our review of the materials submitted in support of, and in opposition to, the motion for summary judgment discloses nothing that justifies a contrary ruling. We defer to the judgment of the district court and affirm its ruling.

Without a determination that Lucas' actions in discharging Dynan were improper, as a matter of law, Dynan's claim of tortious interference with a contract or prospective economic advantage fails. The burden of providing that evidence is assigned to Dynan once the moving party has supported a motion through affidavit and other admissible evidence. *Baldwin v. Dube*, 751 P.2d 388 (Wyo.1988); *Connaghan v. Eighty–Eight Oil Company*, 750 P.2d 1321 (Wyo.1988).

■ The district court, again without offering an explanation, concluded that Lucas was not beyond the scope of his authority. This contention is crucial to Dynan's theory because, so long as Lucas was acting within the scope of his employment, his action may be justified as a matter of law. See *Basin Electric Power Co-op.—Missouri Basin Power Project v. Howton*, 603 P.2d 402 (Wyo.1979) and the cases and authorities there cited. Again, we discover no information that would lead us to a different ruling. If Lucas indeed acted beyond the scope of his employment in discharging Dynan, in the absence of ratification by RMF, logic dictates that Dynan never was discharged. That conclusion is antithetical to Dynan's theory of wrongful termination. A contention that undercuts another theory lacks cogency as a matter of logic. Since Lucas cited no authority to us in support of this theory, we are justified in disposing of it in accordance with our rule that we will not consider issues that are not supported by citation of authority and cogent argument. *Johnston v. Conoco, Inc.*, 758 P.2d 566 (Wyo.1988); *Smith v. Ensley*, 752 P.2d 1374 (Wyo.1988); *Osborn v. Manning*, 685 P.2d 1121 (Wyo. 1984). Were the issue directly posed, reason dictates that an action of wrongful interference directed against an employee or an agent of one of the parties to the contract must merge into any action for breach of the contract because the act of the agent must be attributed to the principal.

We conclude that there are no genuine issues of material fact with respect to Dynan's claim of breach of an employment contract and that RMF and Lucas were entitled to judgment as a matter of law. With respect to the claim that, in any event, the termination was contrary to public policy, we agree with the trial court that this is not a valid contention as a matter of law. There are no genuine issues of material fact with respect to the claim of tortious interference with a contract or prospective economic advantage because, as a matter of law, Dynan was foreclosed from recovery against Lucas. There was no abuse of discretion demonstrated by the record on the part of the district court in denying Dynan leave to amend his complaint, and the district court's ruling on that matter is correct. The district court is affirmed on all of the issues asserted by Dynan.

GOLDEN, Justice, specially concurring.

Because there is a distinction between a public policy and the laws or regulations

that reflect that policy, I specially concur on the question whether a public policy exception applies.

I cannot agree that the firing of employees for refusing to perform acts counter to a public policy does not implicate public policy concerns where regulations governing the industry authorize at-will employment. The parameters of public policies are not set by industry regulations. This approach puts the caboose before the engine. The regulations are evidence of the public policy, in this instance maintaining a stable lending industry by requiring sound lending practices. But the regulations are not, and do not somehow become, the policy. They are simply an administrative reflection of it.

Here, the underlying social policy is maintenance of a sound lending industry, not maintenance of a sound lending industry with at-will employment. Retaliatory discharge for refusing to make bad loans would violate that well-established public policy and satisfy the first factor required to invoke the public policy exception. By any line of reasoning, permitting at-will employment regulations to automatically negate the exception renders it meaningless in these circumstances.

However, I concur in the result because Dynan's circumstances will not satisfy the second required factor, that there be no remedy to protect the interest of the aggrieved employee *or* society. *Allen v. Safeway Stores, Inc.*, 699 P.2d 277, 284 (Wyo.1985). While Dynan has no personal remedy, federal laws and regulations do protect society's interests by providing for regulatory scrutiny of lending practices. *See* U.S.C. § 1464(d) (1982).

This is where Dynan's situation differs from that of the school counselor in *Leonard v. Converse County School District No. 2*, 788 P.2d 1119 (Wyo.1990). In that case I said in dissent that the public policy of combatting child abuse would be thwarted by penalizing teachers who performed their statutory duty to report and assist in investigation of suspected child abuse. If Leonard's contract was not renewed because she performed a statutory duty, then not only was Leonard herself treated unfairly, but society's interest in protecting children from abuse was compromised. In this case it is not necessary that a lending industry employee act in a similarly unfettered manner, not because there was no violation of public policy, but because the public interest is otherwise adequately protected.

When deciding whether the public policy exception may apply we must keep our focus on the ball, which is the social goal itself, and not the regulations developed to further it. If employees are fired for acts consistent with that goal, public policy may be violated. The key question then becomes, does the individual or society have another way to vindicate the public policy? Here, the answer is yes.