Fradus Contracting Company, Inc., Appellant, *v.* Alfred A. Taylor, Commissioner of Street Cleaning of the City of New York, and Others, Respondents.

First Department, May 19, 1922.

Municipal corporations — city of New York — contract to unload scows containing ashes, etc.— contract contemplating use of city owned island as dumping ground and use of city docks thereat — plaintiff entitled to temporary injunction in suit to restrain defendants from interfering with plaintiff in performance of its contract and in erecting plant at island — right of commissioner of street cleaning to approve location for plants limited to additional plant — no adequate remedy at law.

The plaintiff, who had entered into a contract with the city of New York for unloading scows containing mixed ashes, street sweepings and rubbish, was entitled to a temporary injunction in an action brought to restrain the defendants from obstructing or interfering with the plaintiff in the performance of the contract and from obstructing or interfering with it in erecting its plant on the city owned docks at Rikers Island, and to compel the removal of the plant erected by a prior contractor, where it appeared that the plaintiff's bid for the unloading of scows was accepted and the contract therefor became effective on the 2d day of July, 1921, one day after the beginning of the term thereof; that the prior contractors had used the city owned docks at Rikers Island, and that under the advertisement for proposals, bidders were unrestricted with respect to the location of their plant or plants for unloading the scows and were expressly permitted to bid " upon placing one or more unloading plants on Riker's Island, East River, at locations to be approved by the Commissioner."

The city having offered bidders the use of Rikers Island as a dumping ground and having required that the successful bidder should begin unloading on the first day of July, twenty-one days after the bids were received, regardless of the time during that period when the contract might be actually let, bidders were warranted in assuming that the successful bidder would be entitled to use the docks owned by the city at the island and the channels connecting the same with deep water, for it appears that it would have taken upwards of two months to dredge another channel and build another dock.

The right of the commissioner of street cleaning, reserved in the invitation for bids, to approve the location for plants must be limited to the approval of any additional plant that might be necessary to enable the contractor to unload all the scows, and not as giving him permission to compel the contractor to construct docks and dredge channels at a new location before work could be commenced.

The plaintiff did not have an adequate remedy at law, for the reason that the contract entitled the plaintiff to receive only the minimum of five scows daily,

while on the other hand the commissioner had the discretion of compelling the contractor to unload any number of scows in excess thereof, and, therefore, unless the contractor is permitted by the commissioner to perform his contract, it is impossible to know the extent, if any, above the minimum number of scows the commissioner would have delivered for unloading at the island, and the profits that the plaintiff would have made.

APPEAL by the plaintiff, Fradus Contracting Company, Inc., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 9th day of March, 1922, denying plaintiff's motion for an injunction *pendente lite.*

*Edward M. Grout* and *Paul Grout* [*Edward M. Grout* of counsel; *Dean Potter* with him on the brief], for the appellant.

*John P. O'Brien,* Corporation Counsel [*Arthur J. W. Hilly* of counsel; *James P. O'Connor* with him on the brief], for the respondents The City of New York and Alfred A. Taylor, as commissioner, etc.

*Foley & Martin* [*William J. Martin* of counsel; *Patrick J. Dobson* with him on the brief], for the respondent Rodgers & Hagerty, Inc.

LAUGHLIN, J.:

The former commissioner of street cleaning of the city of New York, John P. Leo, duly advertised for proposals to be submitted on the 9th of June, 1921, for unloading scows containing mixed ashes, street sweepings and rubbish, for one year commencing on the 1st day of July, 1921. The plaintiff duly presented a proposal, and, as it was the lowest bidder, the contract was finally awarded to it and was signed by both parties and became effective by the execution of the certificate by the comptroller on the 2d day of July, 1921. Rikers Island in the East river is owned by the city. The northerly half of the island has been filled in and is occupied by the city. The southerly half is surrounded by a bulkhead behind which is considerable low land which the city has been filling in with ashes and other refuse for a long time. It appears that for many years prior to 1919 the only contractor employed by the city to unload such scows was the firm of Dailey & Ivins. That firm built at the bulkhead line of the island two docks known as plants No. 4 and No. 5, and dredged channels thereto for the passage of tugs and scows, and erected derricks on the docks for unloading the scows, and constructed railroad tracks into the interior of the southerly end of the island, and equipped the same with locomotives and dump cars for distributing the material. The firm failed in January, 1919, and in March, 1919, the defendant Rodgers & Hagerty, Inc., which will be referred to as Rodgers & Hagerty,

acquired from the trustee in bankruptcy the plant and equipment of the bankrupts. In the meantime the city leased the equipment of Dailey & Ivins and unloaded the scows itself, and on May 10, 1919, the city entered into a contract with Rodgers & Hagerty for the performance of this work and that contract was extended until March 31, 1920, and from that time until the twenty-ninth of June thereafter the city itself disposed of the ashes and rubbish elsewhere. On the 29th of June, 1920, after duly advertising for proposals, the city let the contract for the ensuing year expiring June 30, 1921, to Rodgers & Hagerty at the contract price of $269.75 per scow. Prior to making that contract Rodgers & Hagerty constructed a third dock known as plant No. 3 at the bulkhead of the island, and equipped it with a derrick, and extended tracks therefrom, and equipped them with locomotives and dumpcars, and dredged a channel thereto. The terms of the contracts, under which the docks were constructed and the dredging was done and the plants and equipment were installed, are not shown by the record; but it was provided in the contract between the city and Rodgers & Hagerty for the year expiring June 30, 1921, that the contractor should at its own expense furnish " all the necessary labor, supervision, plant, docks, bulkheads, wharves, machinery, apparatus, equipment, materials and supplies for the purpose of unloading the scows and disposing of their contents," and that the proposal, bid, advertisement, specifications and bond should be deemed part of the contract. The specifications provided, among other things, that the contractor should at all times and at its own expense do all necessary dredging at the unloading plants owned or controlled by it and maintain a sufficient depth of water to prevent the scows going aground and to permit the unloading thereof without interruption, and that the contractor should furnish safe berths for the mooring of the scows. The board of estimate and apportionment, in approving the award of that contract by formal resolution, provided that its approval was upon certain express terms and conditions to be set forth in the formal notice to the contractors. Those conditions provided, among other things, that permission was granted to the contractor to use Rikers Island as an unloading place, in addition to two other specified places; and that the contractor should not interfere with any plan of the city to install its own unloading plant or plants at such points on the island as it might select, or with the operation thereof; and that at the expiration of the contract the contractor would promptly remove at its own expense all property belonging to it on the island; and that the provisions of such notice should form part of the contract. It appears that said action of the board of

estimate and apportionment was communicated to the contractor by the commissioner of street cleaning and was formally accepted by it, and the contract, as thus modified, was accepted by the contractor.

Under the advertisement for proposals, pursuant to which the contract was made with the plaintiff, bidders were unrestricted with respect to the location of their plant or plants for unloading the scows, and were expressly permitted to bid " upon placing one or more unloading plants on Riker's Island, East River, at locations to be approved by the Commissioner; " and in that event the contractor was required at his own cost and expense promptly to remove the plants and all supplies and materials used thereat from the island at the termination of the contract. Bidders were informed by the advertisement for proposals with respect to the minimum number of scows to be unloaded daily during each month. The smallest number was seven in August, and the largest twenty in January, February and March. It was stated in the advertisement that these numbers were approximate only and were not guaranteed for the reason that the output varied from time to time. The city reserved the right generally to approve or disapprove of the location of plants. Bids were permitted for unloading one or more scows, and the commissioner reserved the right to allot a minimum number of scows daily to the successful bidder, and to require the successful bidder to unload such additional number of scows as the commissioner might see fit to require from time to time, not exceeding the number specified in the bid for any plant. A printed form for proposals was prepared by the commissioner, and it was used by bidders. It contained a blank for filling in the number of scows to be unloaded daily, the price per scow and the location of the plant. The plaintiff filled in this blank to show that it would unload all of the scows at $219 per scow, and gave as the location of its plant Rikers Island. The city having thus offered bidders the use of Rikers Island as a dumping ground, and having required that the successful bidder should begin unloading on the first of July, twenty-one days after the bids were received, regardless of the time during that period when the contract might be actually let, bidders were warranted in assuming that the successful bidder would be entitled to use the docks owned by the city on the island and the channels connecting the same with deep water, for it appears that it would have taken upwards of two months to dredge another channel and build another dock; and, as was to be expected, the plaintiff before submitting a proposal had examined and become familiar with the former contract with Rodgers & Hagerty which obligated the contractor to

remove its plant and equipment immediately upon the expiration of the contract on June 30, 1921. On or about the day after the bids were received, the president of the plaintiff, Jacob Fradus, was requested by the commissioner to call and give particulars with respect to the plaintiff's plant and the method it intended to adopt in unloading the scows. He called and informed the commissioner that the plaintiff had an option on a plant which it intended to install on the city's docks where the plants of Rodgers & Hagerty were then installed. An affidavit made by Fradus in support of the motion is to the effect that the commissioner replied that the removal of the Rodgers & Hagerty plant might damage the city's docks, and he assured the commissioner that in that event he would repair them; that Mr. Steinert, counsel to the street cleaning department, who was present, informed him that the docks belonged to the city; that these docks had been used for unloading such scows by Dailey & Ivins, by Rodgers & Hagerty and by the city during the period during which it was doing the work itself, covering a period of many years; that he stated to the commissioner that, since there would be only eight scows to unload daily during July and seven scows per day during August, the temporary derricks and locomotive cranes upon which, he informed the commissioner, the plaintiff had an option, would answer until the permanent plant could be installed; that each of the three plants of Rodgers & Hagerty on the island had a capacity of four scows a day; that on the fourteenth of June the commissioner by a communication in writing submitted the bids to the board of estimate, and the communication and bids were referred to the committee on finance which held a hearing thereon on the twenty-first of June; that plaintiff was the lowest bidder, but that at the hearing the commissioner advised that the contract be awarded to Rodgers & Hagerty, the third lowest bidder, on the grounds that the plaintiff had no experience in this kind of work, had no plants and was not financially responsible, and on the ground that the plant location proposed by the second lowest bidder was unsatisfactory; that the committee reported in favor of awarding the contract to the plaintiff on condition that it furnish a bond in the sum of $100,000, which was five times the amount required by the advertisement for bids, and on the twenty-fourth of June the board of estimate adopted a resolution approving the award of the contract to the plaintiff on its furnishing such bond; that on the twenty-seventh of June the commissioner notified plaintiff that the contract had been awarded to it, and it gave a bond as required and the contract was signed on the twenty-eighth, but the certificate of the comptroller, required by section 149 of the

Greater New York charter,* in order to validate the contract, to the effect that there remained unapplied and unexpended a balance of the appropriation applicable to the contract sufficient to pay the estimated expense of executing the same, was not made until the second of July; that after signing the contract and on the same day he and Deputy Commissioner Eschmann went to the island and saw that the Rodgers & Hagerty plant No. 3 was not in operation, and that the bucket and dredge had been disconnected; and he informed Eschmann that plaintiff would commence operations at that plant, and that it had the necessary equipment and proposed to lay its own tracks from there back to the dump, and Eschmann answered, " All right, I will report that to the commissioner; " that he pointed out to Eschmann another place on the dock at plant No. 5 between parts of the plant of Rodgers & Hagerty, which plaintiff proposed to use, and Eschmann promised to report that to the commissioner and asked if he could not indicate another landing point, and deponent replied that these were the only available ones, but that he would have plaintiff's engineer look over the island the next day, and, accordingly, they met Eschmann there the next day, and plaintiff's engineer determined that the only available locations were at plants No. 3 and No. 5, and Eschmann promised to report that to the commissioner. On that day plaintiff wrote the commissioner asking for permission to place two unloading plants on said docks then and theretofore used by Rodgers & Hagerty under the former contract, as had been indicated to Eschmann, and stating that, as a temporary means of handling material, it proposed to put in two or more dredges and sufficient tracks, cars and locomotives and any other necessary equipment. On the same day the commissioner acknowledged plaintiff's letter and stated that he had a report from Eschmann with respect to plaintiff's representatives having been at the island, but that Eschmann " makes no mention of outlining such a program as you present," and that he regretted to say that it would not be possible for him to give the desired permission " to use part of the plant now used and controlled by the existing contractor," but that on the advice of Eschmann he approved the location reported by Eschmann as having been designated by plaintiff's president " for a temporary unloading plant just south of Digger No. 5." The moving papers tend to show that the attitude of the commissioner was in the main unfriendly to the plaintiff, and this was indicated by the letter herein quoted in which he assumes without any warrant that the plaintiff, in merely asking his formal approval of its use of the city's docks at these two points, after the expiration of the right of Rodgers

---

* See Laws of 1901, chap. 466, as amd. by Laws of 1917, chap. 401.— [REP.

& Hagerty to use them, was requesting permission to use the plants of Rodgers & Hagerty. On the thirtieth of June the commissioner wrote plaintiff stating that the work under its contract was to begin the next day, and that the street cleaning department was ready to deliver to the plaintiff not less than five scows daily beginning the next day, and as many more as it might see fit from time to time, and requesting advice as to what point plaintiff had provided and where it wished the scows to be delivered. Having refused permission to use the docks the commissioner knew when he wrote the letter that it would be impossible for plaintiff to begin to perform the contract on July first, and that conclusively appears from the fact that on the same day he requested Rodgers & Hagerty to continue the work of unloading the scows until requested to stop by him, and Rodgers & Hagerty agreed so to continue, provided it received written authority therefor from him and he would prevent interference by plaintiff with the operation of any of the plants and equipment on the island. The commissioner agreed to these conditions, and on the same day gave Rodgers & Hagerty authority in writing in the form of a letter in which he specified that the situation presented an emergency authorizing him to hire scows and labor from day to day, and he agreed to pay therefor at the price at which the board of estimate had approved the award of the contract to the plaintiff; and, although Rodgers & Hagerty had already agreed to continue the work, he appealed to the contractor's " sense of civic obligation " to accept the employment and thus prevent a menace to the comfort and health of the citizens, and the contractor promptly accepted in writing the same day. On the seventh of July thereafter the commissioner, pursuant to his letter of June thirtieth, gave Rodgers & Hagerty a more formal emergency contract, which it accepted, under which, as modified by the reduction of the price per scow to $207 made on the 4th of January, 1922, it has ever since unloaded scows at the island. That contract provided, among other things, that it was to begin on the 1st of July, 1921, and to continue from day to day until further notice, and might be terminated at any time at the option of either party upon written notice to the other; that the city would not charge the contractor " any rental for the use of the land, docks or bulkheads upon which your plants, machinery, apparatus, &c., are now placed; " and that the contractor should furnish safe berths and maintain a sufficient depth of water for the mooring of loaded scows at the unloading points, and should at its own expense make all necessary repairs to the docks or bulkheads at Rikers Island; and the attention of the contractor was expressly called by the contract to the then bad

condition of the docks and a portion of the bulkhead at Rikers Island; and it was agreed that the city assumed no responsibility for the same or for any loss or damage that might be occasioned to the property of the contractor by reason thereof or " by reason of said bad condition of the docks or bulkheads or the City-owned property at Riker's Island." It was further expressly understood and agreed thereby as follows: " Also that the present plants and machinery at Riker's Island remain upon the City's property, including the docks and bulkheads at your own risk and that you hereby release the City of New York from all claims for damages which may be caused to said plants or machinery by reason of any defects in the said docks or bulkheads, or the property upon which the same are now placed."

The moving papers further show that the plaintiff, if it had been permitted to use any of the city's docks, could have installed its plant, including derricks and cars, within forty-eight hours, and could have been ready to unload scows within that time; that on the morning of July first the plaintiff's president, superintendent and a gang of men with a boatload of machinery went to the island with a view to landing at the dock at plant No. 3, and found that the landing space had been blocked by Rodgers & Hagerty; and that their tracks near the plant, which had been empty the day before, were filled with cars and locomotives; and that at about ten A. M. Eschmann appeared and notified them that the commissioner would not permit the plaintiff to interfere with the work of Rodgers & Hagerty and would not allow it to land any material at the dock or to lay any tracks, and that the commissioner had arranged with Rodgers & Hagerty to continue the work, and had given him orders to call the police if plaintiff landed any material or interfered with the work of Rodgers & Hagerty; that later the police appeared and stopped plaintiff's employees from attempting to work at that plant; that on July second the plaintiff, having been unable to obtain any more favorable consideration from the commissioner, accepted the site approved by him in his said letter of June twenty-ninth, and on that day began the work of building a dock and dredging a channel at that point and erecting a plant, and, with the exception of laying the tracks, had substantially completed it by August; that the plaintiff was delayed in obtaining permission of the commissioner to cross the tracks of Rodgers & Hagerty, and was ultimately obliged to institute an action against the commissioner, and this resulted in its being allowed to lay its tracks, and it commenced to unload scows at that point on the seventh of November, but was unable to handle more than three daily at that location.

First Department, May, 1922.                    [Vol. 201

The injunctive relief demanded by plaintiff was that the defendants be restrained from interfering with the plaintiff's use of these docks in the performance of its contract with the city. The plaintiff does not claim any right to use the plant or equipment of Rodgers & Hagerty. It is perfectly plain that, if the commissioner is not warranted in continuing the emergency contract with Rodgers & Hagerty the latter has no right to use these docks for any purpose, but is merely entitled to a reasonable time to remove its plant and equipment. If the plaintiff was entitled to use these docks, then it is quite clear that it was the duty of Rodgers & Hagerty on the 30th of June, 1921, or as soon as it could thereafter, to remove its plant and equipment; and on its default the city had the right to remove it, and I think it was the city's duty to the plaintiff so to do, for it is evident that the plaintiff could not install its own plant and equipment or perform its contract while the plant, including the tracks of Rodgers & Hagerty, remained as they had been erected on the island. It seems to me clear that it was contemplated that the contractor should have the privilege of using the channels already dredged to the island and also the city's docks, for in no other manner could the successful bidder have been prepared to proceed with this work within three weeks after the bids were received, and within three days after the contract was let and signed. The city does not attempt to justify the action of the commissioner on the theory that it might have sustained any serious loss by damage or injury to the docks. The plaintiff would have been liable to it in any event for any damage, other than ordinary wear and tear, in using the docks; and it is evident that their construction is not such that any substantial damage would have resulted from their use by the plaintiff. The city stands on the letter of the invitation for proposals, by which the commissioner reserved the right to approve locations for plants. I think that authority may be given full effect by limiting it to the approval of any additional plant that might be necessary to enable the contractor to unload all of the scows. It would be an unreasonable and arbitrary construction of this reserved authority to require a contractor, submitting a proposal predicated on the use of Rikers Island as a dumping ground and agreeing to be prepared to unload all the scows, if so required by the commissioner, within three weeks after submitting the proposal and within three days after the contract was awarded, to propose new locations for unloading plants which would involve the construction of docks and extensive dredging, and to obtain approval thereof by the commissioner and to construct the docks and dredge the channels by July first, for this would have been impossible, and so far as appears would

have served no useful purpose, and would have been of no benefit or advantage to the city. I am, therefore, of opinion that the plaintiff was and is entitled to use these channels and docks, and that the material facts with respect to its right so to do sufficiently appear to warrant injunctive relief in advance of the trial. If it were conceded that the plaintiff's contract entitled it to unload all of the scows used by the city, then it might be said that it has an adequate remedy at law; but that is not conceded, and, on the contrary, it is contended on behalf of the defendants that plaintiff's contract only entitled it to receive the minimum of five scows daily. It is claimed, notwithstanding the provisions of section 541 of the Greater New York charter (as amd. by Laws of 1909, chap. 397) which require that excepting the emergent conditions such work should be let by contract to the lowest bidder after inviting sealed proposals, that one of the purposes of the commissioner in attempting to limit the contractor to a minimum of five scows per day was to enable him to retain discretion and control with respect to the extent to which the island should be used as a dumping ground. Under the guise of emergency contracts the commissioner has been permitting the unloading of scows at other dumping grounds also. Unless, therefore, the contractor is permitted by the commissioner to perform its contract, it is impossible to know to what extent, if any, above the minimum number the commissioner would have delivered scows for unloading at the island. Moreover, it appears that the cost to the contractor per scow would be less, the greater the number of scows unloaded, and that it will be impossible to prove the actual damages sustained by the contractor. I am of opinion that this case on the facts falls within the decision of this court in *Dailey* v. *City of New York* (170 App. Div. 267; affd., 218 N. Y. 665), and within the rule therein stated, as follows: " The measure of damages, of course, would have been the profits which the plaintiffs would have earned from the performance of the contract, and the impossibility of estimating such profits with any degree of accuracy is apparent. The cost of the work now being done could only be determined after a long accounting, and the amount of work which would have been done under the contract is entirely speculative. The contract expressly provided that the city should be under no obligation to deliver to the contractors any specific amount of rubbish. The amount collected by the city varies and is constantly increasing.    *    *    *

" In order to deny one the relief which a court of equity can give, it is not in all cases sufficient that there be a remedy at law. The remedy must be plain and adequate, and as certain, prompt,

complete and efficient to attain the ends of justice and its prompt administration as the remedy in equity."

Furthermore, if these views are correct with respect to the rights of the plaintiff, it follows that the commissioner is not warranted in continuing the emergency contracts, for in that manner the statute requiring that such work be done by contract after receiving sealed proposals would be violated; and public officials should be required to perform their statutory duties, and should not be permitted to subject the taxpayer to the payment of damages for their failure properly to discharge their duties.

It follows that the order should be reversed, with ten dollars costs and disbursements, and the motion granted, with ten dollars costs, to the extent of enjoining the defendants and their agents and servants from in any way obstructing or interfering with plaintiff in the performance of a certain contract, dated on or about June 28, 1921, made between plaintiff and the city of New York by and through its commissioner of street cleaning, for unloading deck scows containing mixed ashes, street sweepings and rubbish at Rikers Island, New York city, and disposing of their contents, and from obstructing or interfering with plaintiff in the use of its plant erected on said Rikers Island and in laying its tracks therefrom, and in removing the tracks, plant and equipment of defendant Rodgers & Hagerty, Inc., in the vicinity thereof, and in doing any and all other things necessary to the expeditious and unhampered performance of its said contract and from preventing use by plaintiff of the docks now on Rikers Island and the channels forming approaches thereto and from preventing the removal by plaintiff of the plants, tracks and equipment of defendant Rodgers & Hagerty, Inc., therefrom, in the event of its failure forthwith to remove the same itself, and that defendant Alfred A. Taylor, commissioner of street cleaning, be enjoined and restrained from awarding any of said work given plaintiff under its contract with the city of New York to the defendant Rodgers & Hagerty, Inc.

CLARKE, P. J., DOWLING, SMITH and PAGE, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs, to the extent stated in the opinion. Settle order on notice.