URBIGKIT, Chief Justice,
dissenting.
I. INTRODUCTION
We create by this decision a new way for a subcontractor-bidder to escape from an inopportunely priced street construction bid. The way now paved is for the subcontractor to go to the owner to get the general contractor’s bid cancelled — no general contract and no subcontract responsibility to meet the terms of its bid. Lacking conviction that this “easy” way out is appropriate for the bidding subcontractor to default and still pass the transactional loss on to the general contractor, I respectfully dissent.
II. EVENTS ABOUT WHICH WE WRITE
This is the “good old boy” process of public contract management. The subcontractor, 71 Construction, Inc., claims to have underbid its asphalt supply paving subcontract supplied to the general contractor, appellant Four Nines Gold, Inc., for street utility work in the City of River-ton, Wyoming. After the bids were opened on July 28, 1989, it was determined that Four Nines was low and 71 Construction was advised of its successful subcontract bid and low price for street surfacing material.
On July 31, 71 Construction as subcontractor was informed by Four Nines that its bid was successful and would be given the subcontract in accord with the bid then accepted. A city council meeting was then scheduled for August 1,1989 to provide for the formal contract award.
On the morning of August 1, 71 Construction’s president called the city engineer to relate that it had underbid its subcontract to Four Nines and wanted out. The admitted purpose of the call by 71 Construction to the city engineer was to secure a denial of Four Nines’ bid so that 71 Construction could escape from its claimed mistake in bidding to supply 25,130 square yards of asphalt material at a price of $3.20 per square yard plus $7,900 mobilization expense reimbursement.[1] Lawsuits were mentioned by 71 Construction in the telephone call with the city engineer as a justification or explanation why Four Nines’ bid should not be accepted since 71 Construction had made a mistake and might choose to do an insufficient job.[2]
*242 It worked. To avoid litigation, the city rejected all bids and rebid the contract with a few minor changes. With its bidding hand exposed, Four Nines was unsuccessful on second bid and subsequently sued 71 Construction for damages in loss of profits resulting from 71 Construction’s activities in successfully defeating the award of the general contract to Four Nines. 71 Construction escaped further responsibility for its improvident bid which had been used by the general contractor in pricing its general contract bid. The claimed loss in profits totalled about $50,000 to Four Nines which provides the substanee of this litigation.
On the complaint for recovery of the profits by Four Nines and against 71 Construction, summary judgment was granted to 71 Construction to relieve it as á matter of law from liability when it undertook to have its principal’s contract vacated or invalidated in order to release its separate responsibility for performance on the supply bid.
III. SUBSTANCE OF ISSUES PRESENTED
Broadly portrayed, the issue in this case determined that there is a liability free ride of the agent to manipulate nonconsummation of the principal’s general contract so that the agent is relieved of its prospective obligations to perform on a subcontract. The scope of this concept of harm causing immunized default in construction cases is self-evident. The rule in this case will pervade any supply or contributory service contract where the agent as a subcontractor wants out after its bid has been made and is accepted by the principal.
In this subcontractor bid reneging, owner contract rejection, and immunized scenario, the majority rejects potential liability for .intentional interference with a prospective contract, breach of contract and bur *243 den of a covenant of good faith and fair dealing. The principal basis adopted is absence of bad faith when 71 Construction set out to deliberately injure Pour Nines for its own benefit, namely immunized default in performance. It is in essence, kill the obligee in order for obligor to escape from agreement to supply food.
I reject the preclusive adaptation in legal synopsis that the interference was not improper since justified by truthful statements and self-interest to either provide a sufficiently confined and determinative record or an appropriate legal thesis for this summary judgment disposition. 71 Construction was not a disassociated third-party stranger to this transaction. That entity was a companion and co-performer in the economic wagon. It arranged to have the horses shot so it was no longer obligated to assist in driving to the conclusion of the journey. 71 Construction escaped scot-free and Four Nines lost opportunity for any reward after journey completion.[3]
IV. ANALYSIS OF THE CASE
We have here an almost classical, intentional interference situation. See Martin v. Wing, 667 P.2d 1159 (Wyo.1983); Carpenter, Interference with Contract Relations, 41 Harv.L.Rev. 728 (1928); Restatement (Second) of Torts § 766B (1979); Annotation, Liability of Third Party for Interference With Prospective Contractual Relationship Between Two Other Parties, 6 A.L.R.4th 195 (1981).
1. Four Nines had a valid expectancy as low bidder for award of the construction contract. Wartensleben v. Willey, 415 P.2d 613 (Wyo.1966).
2. 71 Construction, as a prospective participant, was aware of the proposed contract which, if executed, would create duties and opportunity for its own financial benefit. First Wyoming Bank, Casper v. Mudge, 748 P.2d 713 (Wyo.1988).
3. 71 Construction perceived a more immediate economic benefit by assuring the contract did not come into existence in order that its obligation for performance under the contract would be voided.
4.Acting in the interest of its own economic benefit with intent to harm its bidding principal, 71 Construction managed to have the successful general contract bid rejected and the contractual expectancy of its principal eviscerated.
This sequence of events is similar to the conduct of the Martins in Martin, 667 P.2d 1159, where the action of the defendant was directed to dissuade the anticipated buyer from completion of a house purchase contract. The threat of litigation here has no greater ring of validity than did the suggested flooding in Martin. In any event, whether 71 Construction actually underbid and whether, even if underbid, it would have constituted a problem to anyone but the bidder is no less a question of fact for trial resolution than was the question of flooding in Martin.
The real legal principle at stake here is whether the bidding subcontractor or supplier or performing sub-agent has a privilege as a matter of law to attempt by whatever means to effect avoidance of the principal’s contract in order to secure vacation of its own responsibilities under its separate bid. I remain convinced that Toltec Watershed Imp. Dist. v. Johnston, 717 P.2d 808 (Wyo.1986) was an improvident (and erroneous) decision, but its text provides no authority on this situation where an agent sets out to harm its principal for economic benefit from its separately eliminated responsibility. Allen v. Safeway Stores, Inc., 699 P.2d 277 (Wyo.1985) also provides no authority since the state worker derived no personal advantage in reporting the “bad attitude” of the plaintiffs as store employees. Likewise, the dicta in Prazma v. Kaehne, 768 P.2d 586 (Wyo.1989), relating to access easement litigation, is not persuasive.
V. TORT ELEMENTS
The Arizona court in Snow v. Western Sav. & Loan Ass’n, 152 Ariz. 27, 730 P.2d *244 204, 211-12 (1986) carefully considered the principle involved in applying the five elements of tort, cf. Mudge, 748 P.2d 713 (using four element test), which in some jurisdictions subdivide intention and impropriety as separate elements:
The tort is intentional in the sense that Western must have intended to interfere with the Snows’ contract or have known that this result was substantially certain to be produced by its conduct. Restatement § 8(A) and § 766 comment j; accord 2 F. HARPER, F. JAMES & 0. GRAY, [THE LAW OF TORTS] supra § 6.8 [2d ed. 1986], at 321-22. The question of intent ordinarily is for the finder of fact. * * *
******
The final element — whether a defendant has acted improperly — generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded. 2 F. HARPER, F. JAMES & 0. GRAY, supra § 6.12, at 350-51; Restatement § 767 comment b; H & M Associates v. City of El Centro, 109 Cal.App.3d 399, 409, 167 Cal.Rptr. 392, 398-99 (1980) (question of justification “comprises a factual issue which should properly be placed before the trier of fact”). To be “improper,” an interference must be “wrongful by some measure beyond the fact of the interference itself.” Top Service Body Shop, Inc. v. Allstate Insurance Co., 283 Or. 201, 209, 582 P.2d 1365, 1371 (1978), quoted in 2 F. HARPER, F. JAMES & O. GRAY, supra § 6.6, at 306-07; see also Restatement § 767.
That court, in reversing summary judgment, concluded that triable issues of fact existed on the due-on-sale intentional interference case on both questions of good faith and privilege.
This court has also assessed the relationship of the three terms — privilege, justification and “not improper” — in the same fashion in Basin Elec. Power Co-op.-Missouri Basin Power Project v. Howton, 603 P.2d 402, 405 (Wyo.1979), where, in speaking to the changes in terminology from First Restatement to Second Restatement to use “improperly” rather than “privilege”, we said:
Section 766, Restatement of the Law of Torts (1939), cited in Wartensleben, stated that liability for purposeful interference with a contract will not arise if there was a privilege to act. A cause of action will arise if “one who, without a privilege to do so,” induces another not to perform a contract. The authors of the second edition of Restatement of the Law of Torts (see introductory note to Ch. 37, p. 4, et seq., Vol. 4 (1979)) chose not to use the word privilege or justification in the revised § 766. They considered these terms to lack clarity and therefore not meaningful. Section 766 of the Second Restatement of the Law of Torts (1979) states that “[o]ne who intentionally and improperly interferes with the performance of a contract * * * is subject to liability * * *.” While we do not find this change of language particularly helpful in our inquiry, it still is consistent with the view that however the tort of interference is expressed— whether as conduct “without justification,” “without privilege,” or merely “improper” — the question is one of fact rather than one of law.
The subcontractor bonding case of Morrow v. FBS Ins. Montana-Hoiness LaBar, Inc., 230 Mont. 262, 749 P.2d 1073, 1076 (1988) provides the same authority requiring resolution of intent and whether “improper” is a factual decision:
We cannot say that interference motivated to gain business advantage among the relationships between bonding agents, general contractors, and subcontractors is necessarily proper. And when there is
“room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.”
Restatement (Second) of Torts § 767 at 38-39 (1977).
First, in questioning whether the interference was intentional, the Montana court *245 observed that it certainly was not accidental. After Restatement (Second) of Torts, supra, § 767 is cited, the Montana court analyzed the relationship of decision to summary judgment. That consideration is explicitly appropriate here.
Other Courts have emphasized the impropriety of granting summary judgment where the credibility of an affiant may be crucial to decision of a material fact. See Durant v. Stahlin (Mich.1965), 135 N.W.2d 392, 398; Arnstein v. Porter (2d Cir.1946), 154 F.2d 464, 469-70.
Morrow, 749 P.2d at 1075. The same factual concept reappeared by another reversal in this same case which came after remand by a directed verdict in Phillip R. Morrow, Inc. v. FBS Ins. Montana-Hoiness Debar, Inc., 236 Mont. 394, 770 P.2d 859 (1989). Justification, e.g. privilege or not improper, is a question of fact. Northside Mercury Sales & Service, Inc. v. Ford Motor Co., 871 F.2d 758 (8th Cir.1989); Phil Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781 (8th Cir.1986); In re Scallywags, Inc., 84 B.R. 303 (Bkrtcy.D.Mass.1988); Alyeska Pipeline Service Co. v. Aurora Air Service, Inc., 604 P.2d 1090, 1094 (Alaska 1979); Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (Del.1987); and Larocco v. Bakwin, 108 Ill.App.3d 723, 64 Ill.Dec. 286, 439 N.E.2d 537 (1982).
VI. AFFIRMATIVE DEFENSE
The clear rule explicitly defined furthermore determines that justification-privilege-not improper, all being the same concept, are the affirmative burden for the defendant to demonstrate when the criteria for basic interference has been established. Haupt v. International Harvester Co., 582 F.Supp. 545 (N.D.Ill.1984). The rule generally followed is:
“Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor’s conduct and the relationship between the parties. * * * Justification is an affirmative defense and may not be considered as supporting the trial court’s action in sustaining a demurrer unless it appears on the face of the complaint. * * * ))
Winn v. McCulloch Corp., 60 Cal.App.3d 663, 131 Cal.Rptr. 597, 602 (1976) (quoting Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 206-07, 14 Cal.Rptr. 294, 296, 363 P.2d 310, 312 (1961)). See likewise Kinco, Inc. v. Schueck Steel, Inc., 283 Ark. 72, 671 S.W.2d 178 (1984); Gianelli Distributing Co. v. Beck & Co., 172 Cal.App.3d 1020, 219 Cal.Rptr. 203, 222 (1985); and Boyles v. Thompson, 585 S.W.2d 821 (Tex.Civ.App.1979). Although not specifically defined, the assumptive nature of justification as an affirmative defense appears in Wartensleben, 415 P.2d at 614 and Annotation, Liability for Procuring Breach of Contract, 26 A.L.R.2d 1227, 1263-64 (1952) (and later case service).
The principle is stated appropriately for our review here in H & M Associates v. City of El Centro, 109 Cal.App.3d 399, 167 Cal.Rptr. 392, 396 (1980):
Privilege or justification for the interference is an affirmative defense, not an element of plaintiff’s cause of action, and thus may not be considered in support of the trial court’s action in sustaining a demurrer unless apparent upon the face of the complaint.
See also Federal Pants, Inc. v. Stocking, 762 F.2d 561 (7th Cir.1985); Lowell v. Mother’s Cake & Cookie Co., 79 Cal.App.3d 13, 144 Cal.Rptr. 664 (1978); and Calbom v. Knudtzon, 65 Wash.2d 157, 396 P.2d 148 (1964).[4] The factual issue is purposeful conduct of the actor which results in contract loss. Ronald M. Sharrow, *246 Chartered v. State Farm Mut. Auto. Ins. Co., 306 Md. 764, 511 A.2d 492 (1986). We should take heed from what the Maryland court said:
There is, of course, a big difference between that which is necessary to prove the commission of the tort and that which is necessary merely to allege its commission.
Id. 511 A.2d at 500. The source of the justification defense is said to be derived from Holmes, Privilege, Malice, and Intent, 8 Harv.L.Rev. 1 (1894).
In using the label “wrongful interference” the courts have apparently applied to the protection of business relations the rule which Holmes contended was (or ought to be) a general principle of the common law: that “when a responsible defendant seeks to escape from liability for an act which he had notice was likely to cause temporal damage to another, and which has caused such damage in fact, he must show a justification.” A justification arises when other considerations of public policy are stronger than the policy of protecting business enterprise.
Note, Tortious Interference with Conduct of a Business, 56 Yale L.J. 885, 888 (1947) (quoting Holmes, supra, 8 Harv.L.Rev. at 9).
We are presented here with a summary judgment disposition and not given the benefit of a trial resolution. There is a remarkable similarity between the insurance company case directed to remove an attorney from claimant representation, Thompson v. Allstate Ins. Co., 476 F.2d 746 (5th Cir.1973), and this case where the action was directed to remove the general contractor as a player to provide economic advantage for the actor. Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530 (Fla.1985); Alberts v. Devine, 395 Mass. 59, 479 N.E.2d 113, cert. denied 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985) (induced disclosure of confidential information contrary to the physician-patient relationship); Annotation, Liability in Tort for Interference with Attorney-Client or Physician-Patient Relationship, 26 A.L.R.3d 679 (1969). Similarly, in employment cases, see Davenport v. Epperly, 744 P.2d 1110 (Wyo.1987) and Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div., 281 Pa.Super. 560, 422 A.2d 611 (1980). Cf. Annotation, Liability of One Who Induces Termination of Employment of Another by Threatening to End Own Contractual Relationship with Employer, 79 A.L.R.3d 672 (1977).
VII. EVALUATIVE FACTORS
The evaluative factors which test whether the conduct was “privileged”, “justified”, or “not improper” envision intent consideration by categories provided in Restatement (Second) of Torts, supra, § 767. Mudge, 748 P.2d 713. One of the mistakes made by the majority in analysis and conclusion is applying Restatement (Second) of Torts, supra, § 772(a) without relation to Restatement (Second) of Torts, supra, § 772(b) or in the context of whether improper by the Restatement (Second) of Torts, supra, § 767 evaluative factors.
Section 767 of the Restatement cat-alogues the factors considered in evaluating the propriety of interference with contractual relations. The section reads:
In determining whether an actor’s conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
(a) the nature of the actor’s conduct,
(b) the actor’s motive,
(c) the interests of the other with which the actor’s conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor’s conduct to the interference and
(g) the relations between the parties.
Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 677 (2nd Cir.1983), cert. denied 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). See likewise Northside Mercury Sales & Service, Inc., 871 F.2d 758; Irwin & Leigh *247 ton, Inc., 532 A.2d at 993; La Rocco, 64 Ill.Dec. 286, 439 N.E.2d 537; and Bolz v. Myers, 200 Mont. 286, 651 P.2d 606 (1982). We specifically adopted those factors in Mudge, 748 P.2d at 717.
VIII. COMPARABLE PRECEDENT: TRUTHFULNESS AS A DISPOSITIVE CONCEPT
In the myriad of present intentional interference with contract cases, none is found in which a subcontractor went to the owner to ensure non-award so that the subcontractor could escape a contractually inopportune bid.[5] A case involving similar aspects is Leek v. Brasfield, 226 Ark. 316, 290 S.W.2d 632 (1956), where the defendant’s land was upstream from plaintiff. Someone cut a dam above plaintiffs location in the water course which reduced ponding of water out onto defendant’s land. Plaintiff further wanted the dam repaired to protect from downstream flooding. The county commissioners agreed and hired a contractor to repair the dam. The defendant reciprocated from his upstream landowner status by running the contractor off the construction site by threat of an expensive lawsuit. When the flood came, plaintiff was damaged down below the damaged dam and he sued defendant for scaring the contractor through suggestion of litigation not to take the county contract which had been presented to repair the dam.
Following jury consideration, the damaged landowner plaintiff won. The Arkansas Supreme Court recognized that the wrongful conduct in preventing repair was just as injurious to appellee (plaintiff) as the wrongful act committed by whomever of cutting the dam originally. Words caused action and precisely that result also occurs here where the subcontractor went to the city with the unquestioned purpose of stopping the award of Four Nines’ contract on the basis of the bid in order to be relieved of performance responsibility on its own contract. Here, as in Leek, the issue was properly presented for jury decision. Furthermore, it is apparent that the so-called truth defense of Restatement (Second) of Torts, supra, § 772(a) is subject to content and circumstances. One of those circumstances can be Restatement (Second) of Torts, supra, § 772(b) — whether solicited — which is not in any regard discussed in the majority opinion.
The historic case of Knickerbocker Ice Co. of Baltimore City v. Gardiner Dairy Co. of Baltimore City, 107 Md. 556, 69 A. 405 (1908) has some similarities where a supplier of ice stated that it would cease deliveries to the dairy unless the dairy’s customer discontinued business with the plaintiff. The resulting damage verdict was sustained.
Perhaps the principal circumstance is the inquiry regarding intent with which the action is taken. Williams v. Chittenden Trust Co., 145 Vt. 76, 484 A.2d 911 (1984).
Intent to interfere with a contractual relationship exists if “the actor acts for the primary purpose of interfering with the performance of the contract, and also if he [or she] desires to interfere, even though he [or she] acts for some other purpose in addition.” Restatement (Second) of Torts § 766 comment j (1979). Intent also exists if the actor does not act with the desire to interfere with the contract but knows that interference will *248 be substantially certain to occur as a result of his or her action. Id.
Id. 484 A.2d at 914. That court considered the advice and suggestions where the offending actor offered to do the work for less in architectural planning. True enough, the advice simply indicated that the architect would do the work for less. The court said:
The defendant also argues that its interference was not improper because it merely rendered “honest advice” to the owner, which, it argues, is allowed under § 772 of the Restatement (Second) of Torts. We think, however, that the plaintiff presented sufficient evidence for the jury to find that the defendant’s actions went beyond mere “advice,” and instead constituted architectural services. The defendant prepared sketches, plans and detailed drawings for the project. Therefore, we reject the defendant’s argument.
Id. at 915 (footnote omitted).
The subject is similarly addressed in Scussel v. Balter, 386 So.2d 1227, 1228-29 (Fla.App.1980) (footnote omitted):
Scussel secondly suggests that his actions were protected by the privilege afforded an agent who, upon request, gives “honest advice” that it is in his principal’s best interests to breach an existing relationship. See 4 Restatement (Second) of Torts § 772(b) (1979). We find, however, that the showings in the record of Scussel’s active involvement in Wolf’s affairs and of his personal motivations and ulterior purposes for securing Wolf’s withdrawal from his undertaking with Balter demonstrate the inapplicability of this principle. See London Guarantee & Accident Co. v. Horn, 206 Ill. 493, 69 N.E. 526 (1903); Morgan v. Andrews, 107 Mich. 33, 64 N.W. 869 (1895); W. Prosser, Law of Torts § 129 text and authorities at 944, nn. 5-7 (4th ed. 1971).
The relationship of the truth defense to an affirmed judgment for tortious interference was also recognized in Pony Exp. Cab & Bus, Inc. v. Ward, 841 F.2d 207, 209, aff'd 845 F.2d 1025 (8th Cir.1988) (quoting Pony Express Cab & Bus, Inc. v. Ward, 662 F.Supp. 85, 89 (D.Neb.1987)), were the actor’s statement to the third-party customer was “ ‘a primary reason for the denial of the contract * * *.’ ” The court recognized in footnote that the theory of defamation or business slander overlapped intentional interference with a business expectancy, and truth, as an absolute defense in defamation, did not have the same effectiveness in tortious interference defense. See likewise Walsh v. Glendale Federal Sav. & Loan Ass’n, 1 Cal.App.3d 578, 81 Cal.Rptr. 804 (1969), which recognized that in regard to furnishing credit information, tortious action also falls more completely within Restatement (Second) of Torts, supra, § 772(b).
The court in Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97, 103 (1985) was unpersuaded by a freedom-of-speech argument as a defense to the intentional interference:
The tort complained of here is an intentional wrong to the property rights of another, accomplished by words, not defamatory in themselves, but employed in pursuance of a scheme designed wrongfully to enrich the speaker at the expense of the victim. The law provides a remedy in such cases, and the constitutional guarantees of free speech afford no more protection to the speaker than they do to any other tortfeasor who employes words to commit a criminal or a civil wrong.
The Chaves case has some similarity to our present situation where, involving contracting with a city, the defendant competitor as an architect advised the city that the plaintiff’s charges were excessive and his experience insufficient. The court found a written communication on the subject not to be defamatory in consideration of free speech and truth, but rejected the defense of truth and taxpayer privilege in reversing an appellate court decision which had reversed the original verdict in favor of the plaintiff.
Truthfulness under Restatement (Second) of Torts, supra, § 772(a) is not alone the test since the actual communication involved at least a questionably valid “underbid” statement and then included gener *249 al advice and opinion, including comments about litigation.[6] Consequently, the requirements and function of Restatement (Second) of Torts, supra, § 772(a) and (b) and the intrinsic function of Restatement (Second) of Torts, supra, § 766B are called into analysis. Reliance on Restatement (Second) of Torts, supra, § 772(a) alone is inappropriate and certainly Restatement (Second) of Torts, supra, § 772(b) would be irrelevant under the circumstances because of the failure to meet the first requirement “that [the] advice be requested, * * * ”, Restatement (Second) of Torts, supra, § 772(b). “The privilege [of truth] is conditional and if the occasion were used not to give bona fide advice, but to injure the plaintiff for any ulterior reason, the defendant should lose his privilege and therefore fail in his defense.” Carpenter, supra, 41 Harv.L.Rev. at 749-50 (citing Northern Wisconsin Co-op. Tobacco Pool v. Bekkedal, 182 Wis. 571, 197 N.W. 936 (1923) and Holmes, supra, 8 Harv.L.Rev. at 6).
This difference is of the essence in this case. The city did not go to 71 Construction. We have .unsolicited conduct of 71 Construction in going to the city to raise the specter of litigation and bad workmanship that provided the atmosphere upon which the intentional interference complaint existed and the contractual loss occurred. None of the three criteria for application of Restatement (Second) of Torts, supra, § 772(b) exists in this case: “(1) that advice be requested,” — it was not; “(2) that the advice given be within the scope of the request” — it was not; “and (3) that the advice be honest” — at best, we have a factual decision based upon exactly what the representative of 71 Construction said in order to secure a rebid decision by the city and a release of the subcontractor from the onerous burden of its subcontract proposal.
In Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 404, we set the parameters of the cause of action: “(1) the existence of the contract; (2) defendant’s knowledge of the contract; (3) intentional interference with plaintiffs contract without justification; and (4) resulting damages.” In that case the issue was justification, and we said:
In considering the question of interference with a contract this court has never attempted to define as a matter of law what constitutes reasonable justification for interference with a contract.
Id. (citing Wartensleben, 415 P.2d 613; Board of Trustees of Weston County School Dist. No. 1, Weston County v. Holso, 584 P.2d 1009, reh. denied 587 P.2d 203 (Wyo.1978); and Kvenild v. Taylor, 594 P.2d 972 (Wyo.1979)). Furthermore, we then said:
Nor will we attempt to formulate any hard and fast definitions for the term in the case at bar. The term justification is broad and the question of whether there was an unjustified interference depends upon the facts of each case.
Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 404. And then we quoted with approval the general rule from Carnes v. St. Paul Union Stock-Yards Co., 164 Minn. 457, 205 N.W. 630, 632, reh’g denied 164 Minn. 457, 206 N.W. 396 (1925):
“The courts have not attempted to formulate a rule by which justification or lack of justification may be determined, but have said that in general the issue is largely one of fact for the jury; the standard being reasonable conduct under all the circumstances of the case.”
Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 405. We further quoted from Royal Realty Company v. Levin, 244 Minn. 288, 69 N.W.2d 667, 673 (1955):
“ * * * We need not here concern ourselves with what constitutes sufficient justification. The term is not susceptible of any precise definition, and normally it is a question of fact for the jury’s determination. In any event, the general view is that the burden of proving sufficient *250 justification for the interference rests on the defendants.”
Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 405. We further noted that the authors of the Restatement (Second) of Torts, supra, § 766 lacked clarity even after they substituted “improperly interferes”. Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 405.[7]
While we do not find this change of language particularly helpful in our inquiry, it still is consistent with the view that however the tort of interference is expressed — whether as conduct “without justification,” “without privilege,” or merely “improper” — the question is one of fact rather than one of law.
* * * Good cause, good faith, reasonable conduct, all appear to us to involve factual and not legal determinations. On this question of law versus fact, this remark in 4 Restatement of the Law of Torts, § 767, p. 38, comment 1 (1979), is pertinent:
“ * * * The analogy to negligence continues to hold in the situations where no recognized privilege has been formulated. Here [tortious interference with a contract], as with negligence, when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.”
Id. at 405. We again considered the function of justification in Texas West Oil and Gas Corp. v. Fitzgerald, 726 P.2d 1056 (Wyo.1986) (Texas West I) (majority and dissenting opinion). See, however, Dobbs, Tortious Interference with Contractual Relationships, 34 Ark.L.Rev. 335 (1980). Truthfulness when said to be some kind of excuse for harmful action cannot be extracted from propriety and justification.
IX. CONCLUSION
I conclude the majority improvidently applies Restatement (Second) of Torts, supra, § 772(a) and even more improvidently fails to apply the criteria of Restatement (Second) of Torts, supra, § 767. Clearly, we have determined that the issue is basically one of fact, Texas West I, 726 P.2d 1056 (Thomas, J., specially concurring, n. 1 at 1065)[8], and the burden of proof of justification or culpability remains with the offending party.
This court has directly addressed intentional interference in thirteen cases, but has not clearly or consistently delineated factual content of the issues provided nor the nature of the affirmative defense status for privilege, justification or “not improper decisions”.[9] The Wyoming cases can be categorized within groups, but the basic principle stated in Mudge, 748 P.2d 713; Texas West I, 726 P.2d 1056; Martin, *251 667 P.2d 1159; and Basin Elec. Power Co-op.-Missouri Basin Power Project, 603 P.2d at 405, can realistically be followed as the basic Wyoming law. First excluded are cases where a third party really does not exist: Kvenild, 594 P.2d 972 and Holso, 584 P.2d 1009; and job related duty or right to act by virtue of relationship: Davenport, 744 P.2d 1110; Erickson v. Magill, 713 P.2d 1182 (Wyo.1986); Dehnert v. Arrow Sprinklers, Inc., 705 P.2d 846 (Wyo.1985); and Allen, 699 P.2d 277. In essence, the remaining Wyoming cases addressed intent and privilege-justification-or being not improper as a factual review under the circumstances to either sustain a verdict or judgment or to determine that summary judgment was proper. Wartensleben, 415 P.2d 613.
It is clearly apparent in review of the Wyoming cases that a defined understanding of a consistent theory for bench and bar has not been enumerated by this court sufficient to provide certainty and process for resolution of this field of rapidly expanding law. A defined national precedent provides the guidance for a structured status of the law of intentional interference. That review demonstrates the essential errors in majority decision in this case.
1. A clear factual issue existed which rendered summary judgment inappropriate in any event. Kobielusz v. Wilson, 701 P.2d 559 (Wyo.1985).
2. Self-standing dispositive application of an alleged truthful statement is inappropriate without consideration of the circumstances within which the statement was made and from which the result was adverse to the plaintiff. Scussel, 386 So.2d 1227; Bekkedal, 197 N.W. 936.
3. “Justification”, “privilege” and “not improper” all constitute an affirmative defense to action otherwise constituting intentional interference as a tort and creates a burden of presentation on the defendant which normally invokes a factual resolution. Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 710 P.2d 1025 (1985); Alberts, 479 N.E.2d 113.
The majority opinion not only disrupts normal contract law and agency relationships and inappropriately applies intentional interference tort concepts, but also justifies a character of conduct as insulated from liability which is disingenuous to the thesis of responsibility for intentionally causing harm to another for your own benefit.
Consequently, I dissent.

.The claimed mistake totalled about $30,000 in the subcontract bid of $88,316 total. The bidder explained in a confused discussion in his deposition that as a batch plant operator, he used cost of asphalt mix (aggregate) in his computed price instead of asphalt oil. While the oil was $118 per ton, the mix constituted only six percent of the oil and was priced at about $25 per ton. Consequently, the bid was $14.21 per ton and should have been $21.85 per ton. The record does not reflect how much experience the subcontractor had or how long he had been in the business. The expected job requirement was approximately 300 tons which, when computed on the $7.64 differential, would provide a mis-bid of $19,864 compared to the oil differential of 300 tons at the $81 differential per ton or $24,300. Obviously, none of this totalled $30,-000 as the "purported mistake.” His further calculation in deposition was that his $3.20 per square yard laid down price was underbid from $4.91 or a $1.71 differential. With 25,130 square yards, we would find his total bid mistake to be $43,000 which involved the job of approximately $80,416 plus mobilization of $7,900. Clearly by that bid the 53.5% mistake could not be attributed to using the price of mix rather than oil in computation.

.Particularly for a record limited in factual information as is this case, there are a lot of conflicts in the factual statements. Since this is a summary judgment case, Cordova v. Gosar, 719 P.2d 625 (Wyo.1986), we consider what the disinterested witness, the city engineer Brad Nelson, and William DeLapp, president of Four Nines, factually stated in affidavits. Those statements are comparable and clearly in conflict with the deposition of Steven Loftin, officer of 71 Construction, which revealed that he as the managing officer of 71 Construction had developed a bad memory by the date his deposition was taken. The city engineer's affidavit states:
2. That in July, 1989, the City of Riverton advertised for bids on the Monroe Avenue Project which specifically is called the Economic Development Administration Project No. 05-01-02356;
3. That on or about July 28, 1989, bids for the Monroe Avenue Project contract were opened and that Four Nines [Gjold was the lowest qualified responsible bidder on the contract at $414,790.82, and that shortly thereafter, Four Nines Gold was notified of this fact;
4. That the bids were presented to Jim Gores and Associates, the project engineers *241 and that they recommended that the contract be awarded to Four Nines Gold;
5. That in the morning of August 1, 1989,1 received a telephone call from Steve Loftin who identified himself as being with 71 Construction Company and that his company was a subcontractor for Four Nines Gold on the Monroe Avenue Project for the Bituminous Aggregate Surfacing material;
6. That Loftin indicated that he knew that Four Nines Gold was the low bidder on the Monroe Avenue Project and that 71 Construction had made a $36,000 mistake in its bid as a subcontractor to Four Nines Gold on the Bituminous Aggregate Surfacing material for the project;
7. That Loftin explained in his telephone conversation the nature of the 71 Construction mistake and that 71 Construction "could not do this job for the amount that they had bid it for”, and that Loftin used those words exactly;
8. That Loftin told me about a number of lawsuits in which subcontractors were let out contracts [sic] when they could show mistakes in their bids and other cases where the owner was held responsible for increased costs change orders in the contract were [sic] it was shown that they awarded a contract knowing that there was a mistake in the bid;
9. That Loftin made it perfectly clear to me that he thought that there was a mistake in his bid to Four Nines Gold on the Bituminous Aggregate surfacing material and that he wanted me to know of it prior to the time the contract was awarded to Four Nines Gold;
10. That once Loftin explained the situation to me, I was afraid that if the contract was awarded to Four Nines Gold that 71 Construction would sacrifice the quality of its work or short materials to make up for the mistake in its bid or that Four Nines Gold would ask for a $36,000 change order to cover the mistake, and that the City, as owner, would have to go to extra expenses to make sure that 71 Construction did the job correctly without cutting corners or shorting material;
11. That because of this conversation with Loftin, I began to seriously question whether or not Four Nines Gold could perform the contract with quality acceptable to the City and at the bid price given the subcontractor considering the bid problem with Loftin and 71 Construction;
12. That because of this conversation that I had with Steve Loftin, and only for this reason, I determined that the best course of action for the City was to reject all bids and re-bid the project with a few minor changes;
13. That I reported all of the previously set forth information to Don White, the city attorney, along with my recommendations and he agreed with me and I made the same recommendation to Mayor Albert Brown on the afternoon of August 1, 1989, before the City Council meeting, and all bids were rejected and the project relet for bids with a few minor changes;
14. That the bid of Four Nines Gold had no mistake, error or ambiguity on its face, that Four Nines Gold’s bid bond was in order and that I considered Four Nines Gold to be a reputable company cable of doing the job had the problem not come up with their subcontractor;
15. That had Loftin not called me with the information regarding 71 Construction’s mistake in its subcontract bid on the Bituminous Aggregate Surfacing material to Four Nines Gold and his statement that his company “could not do this job for the amount that they had bid it for”, I would have recommended that Four Nines Gold be awarded the contract and it probably would have been so awarded;
16. That Loftin told me that he had given the same bid on the Bituminous Aggregate surfacing material to other general contractors on this bid, but I also later found out that the second low bidder on the project, Gilpa-trick Construction, used a different subcontractor on this material and that its price was very close to the price 71 Construction gave that supposedly contained the mistake and that any mistake in 71 Construction’s bid was not so low as to call attention to the number.
The affidavit of Mr. DeLapp states in part:
4. That on or about July 12, 1989, the city of Riverton, a municipality located in Fremont County, Wyoming, published notice of an upcoming construction project to be let for bids, said construction project and contract was officially designated as Economic Development Administration Project No. 05-01-02356;
5. That the Monroe Avenue Project concerned the installation of new water and sewer mains and approximately one mile of curb, gutter, and paving on Monroe Avenue located in Riverton, Fremont County, Wyoming;
6. That on or about July 21, 1989,1, acting on behalf of Four Nines, contacted Loftin, an agent and employee of 71 Construction concerning a bid on item # 7 in schedule 2 of the Monroe Avenue Project bid schedule, specifically calling for the supply and application of 25,130 square yards of aggregate bituminous surfacing;
7. That I informed Loftin that Four Nines intended to bid on the Monroe Avenue Project with the city of Riverton, that I wanted a bid from 71 on supplying and laying down 25,130 square yards of the aggregate bituminous surfacing material, and that the deadline for submitting the bids to the city of Riverton on the contract was July 28, 1989, at 2:00 p.m.’
8. That Loftin informed me that 71 had a copy of the bid specifications on the Monroe Avenue Project and that 71 would submit a bid to me for the aggregate bituminous surfacing material and lay down process;
9. That on July 28, 1989, at 9:45 a.m., I had a telephone conference with Loftin while Lof- *242 tin was in Riverton investigating and inspecting the site of the Monroe Avenue Project wherein Loftin, acting for 71, submitted a bid to me in which 71 would supply 25,130 square yards of aggregate bituminous surfacing to me for $3.20 per square yard plus $7,900 mobilization charges for the application equipment;
10. That upon receiving 71’s bid, I informed Loftin that he was the low bidder on the aggregate, and that if Four Nines was low bidder and was awarded the job, 71 would have the subcontract for supplying the aggregate bituminous surfacing material;
11. That shortly thereafter, and before the 2:00 p.m. bid deadline on July 28, 1989, I submitted a bid to the city of Riverton on the Monroe Avenue Project incorporating and using 71’s price at $3.20 per square yard on the aggregate bituminous surfacing material, and that Four Nines relied upon the subcontract bid of 71 in submitting its general contractor bid to the City of Riverton;
12. That on or about 2:00 p.m. on July 28, 1989, the City Engineer, Brad Nelson, opened the bids received and that Four Nines was the low bidder on the Monroe Avenue Project;
13. That later in the morning of July 31, 1989, I called 71’s office and left a message that Four Nines was the low bidder on the Monroe Avenue project and that 71 had the contract to supply and lay down the aggregate bituminous surfacing material at $3.20 per square yard, plus $7,900 mobilization charges when the city of Riverton awarded the contract to Four Nines at its meeting on the evening of August 1, 1989;
14. That on Tuesday, August 1, 1989, our low bid on the Monroe Avenue Project was to be taken to the Riverton City Council Meeting for the formal contract award and that 71 and Loftin had knowledge of this fact because I had told them the previous day;
15. That I relied upon the bid given to me by Loftin and 71 when formulating and computing Four Nines’ bid as general contractor on the Monroe Avenue Project, and I told Loftin specifically that I was going to do the same;
16. That the bid given to me by Loftin and 71 for the aggregate bituminous surfacing material and installation was the low bid, but not so low as to cause me to believe that a mistake had been made and I subsequently learned that the company that ultimately was awarded the work on the Monroe Avenue Project utilized a bid for the aggregate bituminous surfacing material that was very similar to the one Loftin initially gave me;
17. That Four Nines had the ability to perform the Monroe Avenue Project at the amount of its initial bid as general contractor and additionally, make $50,000 profit on the contract;
18. That I was informed by Brad Nelson, City Engineer, on or about August 2, 1989, that all bids had been rejected, the project relet for bids with certain changes, and on rebid, Four Nines was the second lowest bidder on the project;
19. That the bid given to me by 71 on or about July 28, 1989, was not revocable and was an agreement or contract dependent only upon Four Nines being awarded the contract by the Riverton City Council.

. We could probably label this conduct as "Harmful Speech Type 1.” D’Amato, Harmful Speech and the Culture of Indeterminacy, 32 Wm. & Mary L.Rev. 329 (1991).

. It is apparent that the Oregon Supreme Court has developed a contrary construction derived from a conclusion that the Restatement (Second) of Torts which it adopted requires an assertion of proof upon plaintiff to disprove privilege. Top Service Body Shop, Inc. v. Allstate Ins. Co., 283 Or. 201, 582 P.2d 1365 (1978). The authority of the Oregon cases has not found general adaptation in other jurisdictions and certainly does not accord with any approval to be found in the more recent Wyoming decisions.

. See, however, Periman, Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, 49 U.Chi.L.Rev. 61, 99 (1982) (quoting Restatement (Second) of Torts, supra, § 766B) (footnotes omitted):
The Restatement (Second) of Torts imposes liability for intentionally and improperly preventing another person from performing his contract or for causing his performance to be more expensive, and for preventing another from "acquiring or continuing [a] prospective relation.” The defendant in these cases may be a stranger to the severed relationship, or he may be a discontented promisee seeking to avoid his own contractual obligations by preventing the plaintiff from performing.
The author cited Fradus Contracting Co. v. Taylor, 201 A.D. 298, 194 N.Y.S. 286 (1922). The case in footnote also reflected the common law duty to act in good faith. In Fradus Contracting Co., performance by the contractor was prevented by a city official who denied a dock site for contract performance. An injunctive answer was provided.

. With the affidavits in conflict, we are required by our precedent to accept the factual statements included in the affidavits provided in resistance to the motion for summary judgment. Davenport, 744 P.2d 1110; England v. Simmons, 728 P.2d 1137 (Wyo.1986).

. For an assertion about a lack of clarity of the entire subject of intentional interference, see Dobbs, Tortious Interference with Contractual Relationships, 34 Ark.L.Rev. 335 (1980).

. I have difficulty relating Texas West I, and specifically the special concurrence, to then be followed by Texas West II, Texas West Oil and Gas Corp. v. First Interstate Bank of Casper, 743 P.2d 857 (Wyo. 1987), reconfirmed 749 P.2d 278 (Wyo.1988) (Thomas, J., dissenting), with the present language of this majority that here no cause of action is stated. Clearly, in this case, an official representative of 71 Construction for the self-interest of his business took action directed to deter award of the contract to Four Nines in order that it, as subcontractor, would be safe from perceived loss with a specific result which caused damage to Four Nines. 71 Construction acted contrary to the interest of Four Nines in accord with its own countervailing special interest. Here, the conduct resulted in wrongful interference with a contract expectancy, benefit to the actor, and damage to the victimized contractor. If there is a philosophical cohesion and cogency to the Texas West cases, that is exactly the scenario played out as the determinative legal thesis of recovery against the surety and non-recovery against the assignor bank.

. Mudge, 748 P.2d 713; Davenport, 744 P.2d 1110; Texas West II, 743 P.2d 857; Texas West I, 726 P.2d 1056; Toltec Watershed Imp. Dist., 717 P.2d 808; Erickson v. Magill, 713 P.2d 1182 (Wyo.1986); Dehnert v. Arrow Sprinklers, Inc., 705 P.2d 846 (Wyo.1985); Allen, 699 P.2d 277; Martin, 667 P.2d 1159; Basin Elec. Power Coop.-Missouri Basin Power Project, 603 P.2d 402; Kvenild, 594 P.2d 972; Holso, 584 P.2d 1009; Wartensleben, 415 P.2d 613.